863 F.2d 1266
 27 Fed. R. Evid. Serv. 1084
 George E. McGOWAN and wife Maxine McGowan,
Plaintiffs-Appellants (86-6055, 86- 6285), Cross-Appellees,
Donald Kent Berkley, Intervening Plaintiff-Appellant
(86-6056, 86-6285), Cross- Appellee,
v.
COOPER INDUSTRIES, INC., et al., Defendants and Third Party
Plaintiffs- Appellees, Cross-Appellants (86-6284),
Pennwalt Corporation, Third Party Defendant-Appellant
(86-6283, 86-6285), Cross-Appellee.
 Nos. 86-6055, 86-6056, 86-6283, 86-6284 and 86-6285.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 3, 1987.
Decided Dec. 20, 1988.
Rehearing Denied in Nos. 86-6055, 86-6056, 86-6283 and
86-6284 Feb. 23, 1989.
 
 James W. Owens (argued), Karen Alderdice, Paducah, Ky., for George and Maxine McGowan.
 Bryce Franklin, Jr., Williams, Housman, Sparks & Franklin, Paducah, Ky., for Donald Berkley.
 Thomas Russell, Whitlow, Roberts, Houston & Russell, Paducah, Ky., for Pennwalt Corp.
 James L. Hardy, Hardy, Terrell-Boswell, Van F. Sims (argued), Paducah, Ky., for Cooper Industries, Inc.
 John T. Reed, Paducah, Ky., for Babcock.
 Before MERRITT, KRUPANSKY and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff George McGowan and intervening plaintiff Donald Berkley suffered severe injuries when a newly rebuilt air compressor owned by their employer, Pennwalt Corporation, exploded during a test run. They sued Cooper Industries, Inc., which manufactured the compressor, and Harold Babcock, a factory representative for Cooper who inspected the rebuilding of the compressor at Pennwalt's plant in Calvert City, Kentucky. Their action was brought on negligence and product liability theories. In addition, third party actions were filed by the defendants against Pennwalt Corporation for indemnity and contribution. Pennwalt, in turn, filed a counterclaim against Cooper Industries and Babcock for property damage and reimbursement for worker compensation sums paid to Pennwalt's employees, McGowan and Berkley.
 
 
 2
 The jury returned a verdict for Cooper Industries and Babcock, and the plaintiffs and Pennwalt now appeal.
 
 
 3
 The principal issue is whether the district court committed reversible error by excluding testimony offered by the plaintiffs and Pennwalt concerning the customary duties of factory representatives in Cooper's industry, as well as testimony concerning Pennwalt's routine business practice of deferring to the expertise of such factory representatives.
 
 
 4
 Our answer is that the court's rulings excluding the evidence were, under the circumstances, error that resulted in substantial prejudice to the appellants. We must, therefore, vacate the district court's judgment.
 
 I.
 
 5
 Pennwalt Corporation operates a chemical plant in Calvert City, Kentucky, which employed plaintiff George McGowan and intervening plaintiff Donald Berkley. In March 1984, Pennwalt maintenance personnel were rebuilding a large air compressor which Pennwalt had previously purchased from the manufacturer, a subsidiary of defendant Cooper Industries, and which had been damaged in October 1983. Berkley was a maintenance foreman and McGowan was a mechanic working on the project.
 
 
 6
 The compressor was the principal component of a system which supplied compressed air throughout the Pennwalt plant for use in various plant functions. The compressor unit was hooked up to a series of discharge pipes which transported the compressed air to the place where it was needed. A block valve, which was located in the discharge piping some distance from the compressor itself, was closed so that the air flow could be stopped while the compressor was being repaired. Pennwalt had originally installed the block valve and discharge piping itself.
 
 
 7
 The rebuild project began shortly after the compressor was damaged, but could not be completed without Cooper's advice and assistance. On March 8, 1984, Pennwalt requested assistance from Cooper and, the next day, Pennwalt issued a written "purchase requisition" requesting:
 
 
 8
 Services required for factory service man to inspect assembly of one ... air compressor.
 
 
 9
 Pennwalt's subsequent "purchase order" to Cooper reiterated this transaction description. On March 12, Cooper sent defendant Babcock to the Pennwalt plant.
 
 
 10
 Babcock, who supervised the work of McGowan and the two mechanics rebuilding the compressor, suggested that some internal adjustments be made to the compressor unit. Once these adjustments were completed, on March 15, the compressor was considered ready for a test run. Babcock directed two successful preliminary test runs during which only the compressor motor was started. The purpose of these preliminary tests was to check for internal noise or vibration before compressing any air. A complete test was scheduled for later that day after the installation of the discharge pipes.
 
 
 11
 A Pennwalt employee, James Hurt, who died before trial, was summoned to start the compressor. Within a few seconds after it was started, the compressor exploded. McGowan lost both legs and Berkley and Babcock suffered leg and other injuries. A subsequent inspection showed that the discharge block valve in the piping attached to the compressor was closed at the time of the test.
 
 
 12
 The testimony of witnesses concerning the events which transpired immediately prior to the explosion is in substantial conflict. Babcock testified that his work on the compressor had been completed and that he remained at the Pennwalt plant solely as an observer. Hurt, the employee who started the compressor prior to the explosion, stated in his deposition that Babcock directed the test and instructed him to warm up the compressor before opening the block valve. Hurt further stated that he followed Babcock's instructions because factory representatives are usually in charge of checking Pennwalt's machines. Babcock denied that he gave Hurt any instructions or directions of any kind.
 
 
 13
 Following the accident, McGowan and his wife filed this action against defendants Cooper Industries and Babcock, seeking recovery on products liability and negligence theories. The complaint alleged that Babcock had negligently supervised the rebuild and start-up of the compressor. Berkley subsequently filed an intervening complaint which reiterated the same allegations.
 
 
 14
 Cooper filed a third-party complaint against Pennwalt and Berkley, alleging that the negligence of Pennwalt employees had caused the compressor explosion, and sought indemnity and contribution. Babcock also filed a third-party complaint against Pennwalt, seeking recovery for his injuries as well as indemnity and contribution. Pennwalt filed counterclaims against Cooper and Babcock seeking recovery for property damage and for workmen's compensation payments made to McGowan and Berkley.
 
 
 15
 Babcock's claims against Pennwalt were settled during the course of the trial. The remaining claims were submitted to the jury which was instructed to answer special interrogatories. The jury found that neither Cooper nor Babcock was liable but, contrary to the court's instructions, completed the remaining interrogatories, finding Berkley and Pennwalt negligent, and announcing the amount of damages suffered by McGowan and Berkley.
 
 
 16
 The district court entered judgment dismissing plaintiffs' claims. The McGowans, Berkley, and Pennwalt (referred to collectively as appellants) appeal. Babcock and Cooper (referred to collectively as appellees) filed a protective cross-appeal.
 
 II.
 
 17
 At trial, appellants sought to introduce testimony by George Green concerning the customary duties of field service representatives in Cooper's industry, and his opinion as to the lack of care exercised by Babcock on the rebuild project. Green testified that as an engineer he worked frequently with factory representatives and was generally familiar with their procedures. Appellants offered Green as an expert witness on the customs in Cooper's industry.
 
 
 18
 The district court disallowed Green's proffered testimony based on two separate rationale. First, the court held that Green's testimony, if allowed, would tend to broaden the scope of Babcock's duties. The court apparently reasoned that Babcock's duties were limited to those contained in the "purchase order" issued by Pennwalt to Cooper Industries ("to inspect the assembly of one ... air compressor") and could not be expanded by parol evidence. Second, the court refused to allow Green to express his opinion on the care exercised by Babcock on the rebuild project, reasoning that the testimony would be an opinion on a matter which did not require scientific, technical, or other specialized knowledge and would not be helpful to the jury.
 
 A.
 
 19
 With respect to Green's proffered expert testimony on industry custom, appellants argue that the court should have permitted Green to testify because, based on his training and experience, he knew and could testify as to the duties customarily assumed by service representatives in Cooper's industry. Appellants contend that factory representatives in Cooper's industry, including Babcock, when called in for consultation, customarily take charge of all tasks associated with rebuilding and starting compressors, including tasks related to block valves and safety devices, even though such devices are not a part of the compressor units which Cooper manufactures. Appellants also contend that factory representatives customarily give directions to employees on final start-ups of rebuilt compressors. The appellants contend that Babcock was negligent in not noticing that the compressor's block valve was closed before he directed the final start-up. The court disallowed the testimony, reading Pennwalt's purchase order as limiting Babcock's duties to work on the compressor unit itself, and not on the external piping, including the block valve. The court below apparently reasoned that Green's proffered testimony would not be helpful because the scope of Babcock's duty, as plainly stated in the purchase order, was not in issue. Appellants, however, contend that under the facts of this case, Kentucky law creates a duty separate and distinct from appellees' contractual duty as described in the purchase order. We agree and thus conclude that the trial court erred in rejecting Green's testimony as to the customs in Cooper's industry concerning the duties of a manufacturer's factory representative.
 
 
 20
 In Raymer v. United States, 660 F.2d 1136 (6th Cir.1981), cert. denied, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982), the personal representatives of two employees of a Kentucky coal mining company, Peabody Coal, brought suit against the United States under the Federal Tort Claims Act. The employees died when the front-end loader they were driving left an elevated road. Contrary to federal regulations, the loader was not equipped with roll bars. The personal representatives sought recovery in part based upon the Bureau of Mines' allegedly negligent inspections of the company's loader. The Bureau's inspectors had previously granted Peabody a number of extensions which effectively delayed Peabody's mandatory compliance with the roll bar regulation.
 
 
 21
 This court was required to determine whether Kentucky recognized a cause of action for negligent inspection. We found that no Kentucky case had previously dealt with the issue but reasoned that the Supreme Court of Kentucky would impose the requirements of Sec. 324A of the Second Restatement of Torts in formulating a cause of action based on negligent inspection. "We believe that the Kentucky court would impose essentially the same requirements for recovery, whether or not it adopted the precise formulation of Restatement [Section 324A]." Raymer, 660 F.2d at 1142-43. Section 324A provides that:
 
 
 22
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 
 
 23
 (a) his failure to exercise reasonable care increases the risk of such harm, or
 
 
 24
 (b) he has undertaken to perform a duty owed by the other to the third person, or
 
 
 25
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 
 
 26
 Raymer, 660 F.2d at 1142 (emphasis added).
 
 
 27
 The Sec. 324A tort duties recognized in Raymer apply in this case and arise by operation of law, separate and distinct from appellees' contractually created duties. Tort duties "are obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction." Prosser & Keeton, Law of Torts Sec. 92 at 656 (5th ed. 1984).
 
 
 28
 Under Sec. 324A(c), the person conducting the inspection--
 
 
 29
 is subject to liability to a third person where the harm is suffered because of the reliance of the other for whom he undertakes to render the services, or of the third person himself, upon his undertaking. This is true whether or not the negligence of the [inspector] has created any new risk or increased an existing one. Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the [inspector] had created the risk.
 
 
 30
 Restatement (Second) of Torts Sec. 324A comment e (1965).
 
 
 31
 Evidence of the responsibilities that are customarily undertaken by factory representatives in Cooper's Industries was crucial to enable the jury (1) to determine the contours of the duty of care assumed by Babcock, and (2) to assess the justifiability of appellants' reliance. If it was customary in the air compressor rebuilding industry for manufacturers like Cooper, who are called in by a customer for consultation on air compressor repair and rebuilding jobs, to typically take charge and supervise the customer's employees, and for purchasers and their employees, like Pennwalt, McGowan, and Berkley, to typically rely upon service representatives to inspect the entire air compressor hook up, including block valves and discharge pipes, then Cooper may have assumed a duty greater than that described in the purchase order itself ("to inspect assembly of one ... air compressor"). Of course, Cooper may argue that the purchase order evinces an intent not to assume a duty to inspect more than the rebuilt compressor itself. However, appellants were entitled to an opportunity to establish, if they could, that it is the custom in the industry to assume otherwise. Nonetheless, Green was precluded from testifying as an expert on the existence of an industry-wide duty broader than that stated in the purchase order. Assuming the adequacy of his qualifications as an expert on the customary duties of a factory representative in the industry--qualifications the court apparently did not question--Green, through his technical and specialized knowledge, could have helped the jury to better determine the scope of the duty assumed by Babcock.
 
 
 32
 The standard of review for a district court's decision to exclude expert testimony on industry custom is an abuse of discretion. Otwell v. Motel 6, Inc., 755 F.2d 665 (8th Cir.1985). A trial court is accorded wide discretion in determining the admissibility of evidence challenged as irrelevant, and it is a discretion which is not disturbed on appeal if the reviewing court is able to say that the ruling excluding the evidence, even if erroneous, did not result in a substantial injustice, because
 
 
 33
 no error in the admission or exclusion of evidence is ground for reversal or granting a new trial unless refusal to take such action appears to the court to be inconsistent with substantial justice.
 
 
 34
 TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 550 (6th Cir.1981). The jury was instructed that Babcock, as an employee of Cooper, was under a duty to exercise the ordinary care generally required under the same or similar circumstances. The jury found that Babcock had complied with his duty. However, the court's exclusion of Green's testimony on industry custom enabled the jury to find that Babcock had complied with the standard of care of the purchase order rather than the potentially broader standard of Sec. 324A(c). Assuming the purchase order was the parties' written contract, Sec. 324A(c) requires a weighing of circumstances beyond the contract terms themselves, including whether appellants' reliance was justified, industry custom as a source of appellants' reliance, and the contract itself as a possible limitation of the industry's custom. Having been precluded by the court's ruling from considering Babcock's performance in the light of the full scope of his duties, the jury was unable to meaningfully apportion fault among Babcock, Cooper, Pennwalt, McGowan, and Berkley, in a manner consistent with substantial justice. Thus, we conclude that the trial court's ruling excluding Green's proffered evidence of the customary use of factory representatives in Cooper's industry was error and not within the reasonable discretion of the district court, and, under the circumstances, unfairly prejudicial to the appellants.
 
 B.
 
 35
 Appellants were also unsuccessful in their attempt to introduce testimony from Pennwalt personnel that Pennwalt routinely looked to factory representatives as experts who did everything necessary to restart compressors being repaired or rebuilt. In particular, appellants proffered the following testimony (on avowal) from Phil Wyatt, a Pennwalt employee:
 
 
 36
 Q. Mr. Wyatt, does Pennwalt have any standard policy or procedure that it follows when a manufacturer's representative comes to the plant to work on a piece of machinery insofar as the supervision and direction of employees?
 
 
 37
 A. Yes, we do.
 
 
 38
 Q. Okay. What is that procedure?
 
 
 39
 A. Our normal procedure is that workmen are assigned to work with and for the factory service rep. He directs their moves. Throughout the course of the day, they spend virtually all of his time with the job and with those workmen, and he actually serves, for practical purposes, the front line of supervisor concerning that job and that job only.
 
 
 40
 Q. Was that procedure followed with regard to Mr. Babcock?
 
 
 41
 A. Yes, sir.
 
 
 42
 Q. And is this something, by that I mean the visit to Pennwalt by manufacturers' representatives, is that something that happens once-a-year, or is it something that happens very often, or how would you characterize it?
 
 
 43
 A. It happens very, very often.
 
 
 44
 The rationale for admitting evidence of Pennwalt's routine business practice is inextricably linked to the rationale for admitting evidence of the customs of Cooper's industry; that is, to prove the scope of the duty undertaken by Babcock as a factory representative summoned to Pennwalt's plant. The district court disallowed Wyatt's testimony, reasoning that Pennwalt's routine business practices, like Cooper's industry customs, were inadmissible to "expand" the scope of Babcock's and Cooper's contractual duties beyond those described in the purchase order. However, as we have said, Kentucky law imposes the separate and distinct tort duties described in Restatement Sec. 324A upon "[o]ne who undertakes ... for consideration to render service to another." Consequently, just as in the case of Green's proffered testimony on the custom in Cooper's industry concerning the duties of a factory representative, Wyatt's testimony of Pennwalt's routine business practice in relying upon the expertise of a factory representative was relevant to establishing the contours of Babcock's duties.
 
 
 45
 If the purchase order was the only source of Babcock's duties, then its clear language would prevail over any proffered testimony on Pennwalt's routine practices as a service customer. However, the duty which Sec. 324A imposes may not be as limited as that expressed in the purchase order. Evidence of routine practices and expectations of service customers is as relevant as the industry customs of service representatives. Evidence that Pennwalt routinely relied on an industry custom in which service representatives directed entire maintenance and repair projects, including problems with both the compressor unit itself and the external discharge piping and block valves, would define the scope of Babcock's duty more broadly than the duty expressed in the purchase order. Without this evidence, the jury was unable to make a meaningful apportionment of the fault of Babcock and Cooper in relation to the fault of Pennwalt and its employees. Like the exclusion of Green's proffered testimony on the custom in Cooper's industry, the exclusion of Wyatt's testimony concerning the routine business practice in Pennwalt's industry was an error which precluded the jury from receiving relevant evidence defining the duties of Babcock and Cooper and which substantially prejudiced appellants' case. Accordingly, we are required to vacate the district court's judgment. TCP Industries, Inc., 661 F.2d at 550.
 
 III.
 
 46
 Appellants also proffered Green's opinion testimony on the adequacy of Babcock's performance on the compressor rebuild project. Green would have testified that Babcock (1) was "the most knowledgeable" person present with respect to compressor operations; (2) was actually performing a start-up operation for Pennwalt; and (3) was negligent in failing to confirm that the discharge valve was open, which was "the final responsibility of [Cooper]...." The district court excluded Green's proffered testimony, concluding that it was not based on Green's status as an expert. The court reasoned that the testimony was not based on "scientific, technical, or other specialized knowledge," but rather on Green's lay opinion of the facts of the case and that as such, his opinion would not "assist the jury on a fact that they can decide as well as an expert." We agree entirely. Green's testimony was not inadmissible solely because it embraced an ultimate issue in the case, Fed.R.Evid. 704(a). Rather, it was inadmissible either as a lay opinion under Rule 701 or as an expert opinion under Rule 702 simply because it would not have been "helpful ... to a determination of a fact in issue" or have "assist[ed] the trier of fact to understand the evidence...."
 
 
 47
 As the Advisory Committee note explains, certain opinions which embrace an ultimate issue will be objectionable on other grounds.
 
 
 48
 Under Rule 701 and 702 opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach.... They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.
 
 
 49
 Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir.1985) (quoting Fed.R.Evid. 704 advisory committee's note).
 
 
 50
 Appellants' contention that Green's testimony on the adequacy of Babcock's performance demonstrates the existence of an industry custom ignores the distinction between the issues of duty and breach. Initially, the jury had to determine the appropriate scope of Babcock's duty. In this regard, Green's testimony on industry custom was helpful and should have been admitted under Rule 702 as specialized knowledge outside of a lay juror's experience. But once the jury heard all of the evidence on the scope of Babcock's duty, it was as qualified as Green to determine whether Babcock breached that duty. Green's proffered testimony as to the adequacy of Babcock's performance consisted of opinions which were not helpful to the jury because they addressed matters that were equally within the competence of the jurors to understand and decide, and thus were inadmissible under Fed.R.Evid. 701 and 702.
 
 IV.
 
 51
 Although our disposition of the case obviates the need to address appellants' remaining assignments of error, we nonetheless address two remaining issues of concern, in order to guide the district court in the event of retrial of the case.
 
 
 52
 The case was submitted to the jury upon special interrogatories. Instruction three asked the jury the following question:
 
 
 53
 Are you satisfied from the evidence that Harold Babcock failed to comply with his duty and that this failure was a substantial factor in causing the accident?
 
 
 54
 The jury answered "No." Instruction four asked whether Cooper was liable on the products liability claims of Berkley and McGowan. The jury again answered "No." The following directive succeeded instructions three and four:
 
 
 55
 If your answers to Instructions No. 3 or 4 are yes, please proceed to the next instruction. If your answers to Instructions No. 3 and 4 are no, then please return to the courtroom.
 
 
 56
 Contrary to their instructions, the jury completed the remaining interrogatories, finding both Berkley and Pennwalt negligent and computing the damages suffered by both McGowan ($1,061,673.89) and Berkley ($553,205.83).
 
 
 57
 Appellants argue that the verdict is meaningless because it both finds for the defendant and awards damages to the plaintiff. They cite Anderson's Executrix v. Hockensmith, 322 S.W.2d 489 (Ky.Op.1959), in which the court ordered a new trial when a jury both awarded the plaintiff damages and found for the defendant. The Kentucky Court of Appeals (then Kentucky's Supreme Court) held that:
 
 
 58
 [W]here a verdict is so uncertain, ambiguous, contradictory, or illogical that it cannot be clearly ascertained who it is for or against or what facts were found and the court cannot reasonably construe the language so as to give a fact to what the jury unmistakably found as a basis of a judgment thereon, the vice in the verdict is more than formal. Such a condition is of the substance and affects the merits of the case.
 
 
 59
 Anderson's Executrix, 322 S.W.2d at pp. 490-91.
 
 
 60
 Anderson is inapposite to the case at bar. In Anderson, it was uncertain whether the jury found for the plaintiff or the defendant because there were no special interrogatories. In this case, the jury found that the appellees were not liable and that the plaintiffs had been damaged. However, the jury also went on to find third-party defendant Pennwalt and plaintiff Berkley negligent. Unlike Anderson, there is no confusion here over which parties the jury found responsible for Berkley's and McGowan's injuries. We can safely assume that the jury simply did not heed the court's instruction to return to the courtroom after finding the appellees not liable but, instead, went on to complete the remaining instructions in a manner consistent with their conclusion that the plaintiffs had in fact been damaged, but that such damages resulted from the negligence of Pennwalt and Berkley, and not from that of the appellees. "Twenty-twenty" appellate hindsight suggests that the district court might have headed off any subsequent assignment of error in the matter by asking the jury to explain its reason for disregarding the court's instruction to return to the courtroom if it answered interrogatories 3 and 4 in the negative.V.
 
 
 61
 James Hurt, the Pennwalt employee who started the compressor and who died prior to the trial, gave four statements about the incident. Three were made shortly after the explosion, and one after the plaintiff brought this action. All four statements indicate that Babcock directed the start-up operation.
 
 
 62
 Hurt's most recent statement, a deposition, was read at trial. After Babcock disputed Hurt's testimony that Babcock ordered Hurt to start the compressor, appellants unsuccessfully sought to introduce Hurt's earlier, consistent statements. Appellants contend the statements are admissible under Fed.R.Evid. 801(d)(1)(B), which provides:
 
 
 63
 A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and is offered to rebut an expressed or implied charge against him of recent fabrication or improper influence or motive.
 
 
 64
 Appellant's argument is without merit. The purpose of Rule 801(d)(1)(B) is to rehabilitate witnesses whose testimony is discredited, as the rule says, as being the result "of recent fabrication or improper influence or motive." Appellants do not argue that the defendants have ever claimed, implicitly or explicitly, that Hurt's deposition testimony was the product of recent fabrication or improper influence or motive.
 
 
 65
 Admitting Hurt's prior statements would only serve to bolster his deposition testimony after it had been disputed by another witness. This would allow any witness whose testimony is disputed by his opponent to offer cumulative prior consistent statements which are hearsay and clearly not within the scope of 801(d)(1)(B).
 
 VI.
 
 66
 Appellees Babcock and Cooper have filed a protective cross-appeal on the dismissal of their claims against Pennwalt for indemnity and contribution for any sums for which they may be liable to Berkley and McGowan. Since we must vacate the judgment entered by the district court, we reverse that portion of the district court's decision dismissing appellees' aforementioned claims.
 
 VII.
 
 67
 Accordingly, we VACATE the judgment of the district court finding appellees not liable. Further, we REVERSE the judgment of the district court dismissing the claims of Babcock and Cooper for indemnity and contribution, and REMAND the case for proceedings consistent with this opinion.
 
 
 68
 KRUPANSKY, Circuit Judge, concurring in part, dissenting in part.
 
 
 69
 I concur with the panel majority's disposition of sections III, IV, and V of its opinion; however, I cannot in conscience join the panel majority in its disposition of sections II and III of its decision wherein, by an erroneous application of Sec. 324A Second Restatement of Torts, it forecloses individuals, firms, and corporations from limiting the liability of their contractual commitments.
 
 
 70
 The district court in the instant case excluded the testimony of George Green (Green) and Phil Wyatt (Wyatt), employees of Pennwalt (Pennwalt), a third-party defendant to this controversy, implicating industry custom and practice concerning the scope of responsibilities generally delegated to and assumed by service representatives when performing services of the type here in issue. The court denied the admission of this proffered testimony because, after a voir dire review of the witnesses, it concluded that the service contract between Cooper Industries (Cooper), incorporated into a purchase order between it and Pennwalt, specifically identified and defined the scope of the services to be performed by Cooper's representative, Babcock and because of the patent impropriety of the form of the proffered questions and answers. Accordingly, the court ruled the testimony to be highly prejudicial personal expressions of opinion on the ultimate issue of common law negligence which determination was within the exclusive domain of the factfinder, in this case, the jury. The court also observed that the responsibilities assumed by service representatives of companies other than Cooper could not be unilaterally imposed upon Cooper without its express or implied consent or undertaking. In the instant case, Cooper, by the concise, unambiguous language of its service contract with Pennwalt, identified, defined and limited the scope of its responsibility to "services required to inspect assembly " of the said compressor, and "services required for factory service man to inspect assembly of one 16 X 10 X 7 HACP Pennwalt air compressor CL No. 106780." As more fully hereinafter discussed, the language of section 324A of the Restatement 2d of Torts notwithstanding, to extend the precise language of the agreement beyond the intentions of the contracting parties by judicial edict is offensive to existing fundamental concepts of basic contractual precedent.
 
 
 71
 At all times here in issue, Pennwalt operated a chemical plant in Calvert City, Kentucky. In March of 1984, its maintenance personnel were rebuilding a large air compressor which Pennwalt had purchased from the manufacturer, a subsidiary of defendant Cooper in July of 1967, which had been damaged in October of 1983. The compressor supplied compressed air throughout the Pennwalt installation for use in various plant functions. The extensive air conduction system for the compressed air supplied by the compressor had been designed, manufactured, installed, and operated exclusively by Pennwalt. Cooper had not participated in either the design, manufacture, or installation of the conduction system including the block valves and discharge pipes which were an integral part of Pennwalt's installation. On March 15, 1984, Cooper's representative, Babcock, arrived at the Pennwalt plant and, pursuant to Cooper's contract with Pennwalt, undertook inspection of the assembly of the rebuilt compressor which was being completed by George McGowan (McGowan) and two other Pennwalt mechanics. During the four days during which he observed the assembly of the compressor, he made various suggestions to the Pennwalt employees, which were implemented. On the morning of his fourth day at the Pennwalt plant, Babcock reported to Donald Kent Berkley (Berkley), Pennwalt's foreman, and his immediate supervisor, Phillip Wyatt (Wyatt), that the assembly of the compressor had been satisfactorily completed by Pennwalt's mechanics and was ready for testing. Berkley summoned James Hurt (Hurt), Pennwalt's compressor operator, to start and operate the compressor during the tests. He described Hurt's job as:
 
 
 72
 Q. What is the job of an operator?
 
 
 73
 A. Well, operator's responsible for all the equipment in his area as far as the operation of it. That would include the start-up or shut-down of a piece of equipment such as this air compressor.
 
 
 74
 Wayne O'Quinn, Pennwalt's plant manager testified that:
 
 
 75
 Q. And who, under Mr. Wyatt, would have been the actual foreman on the repair job?
 
 
 76
 A. Kent Berkley.
 
 
 77
 Q. Okay. Is it a procedure at the Calvert City plant that anytime a compressor was started, that an operator is called to start that compressor?
 
 
 78
 A. That's our general procedure.
 
 
 79
 Q. And is the operator responsible, either by union agreement or by plant protocol, for starting the compressor?
 
 
 80
 A. Yes, sir.
 
 
 81
 Q. Is anyone else authorized to start a compressor at Pennwalt other than an operator?
 
 
 82
 A. Generally not.
 
 
 83
 Q. And does Pennwalt train its operators to know what they should and shouldn't do before they start a compressor or any other piece of equipment they might be starting?
 
 
 84
 A. Yes.
 
 
 85
 Hurt, in the presence of Babcock, conducted two test runs of the compressor which operated to Babcock's satisfaction whereupon Babcock advised Berkley, his supervisor Wyatt, and the two machinists McGowan and McAllister, that the compressor could be "put on-line." The test runs had been conducted without the compressor suction valves in place to verify the proper mechanical operation of the compressor; consequently, no compressed air was being induced into Pennwalt's air distribution system. After releasing the compressor for "on-line" operation, Babcock went to lunch. The available record does not reflect, beyond the following testimony of John Sklavos (Sklavos), Pennwalt's mechanical engineer who drafted the Cooper requisition order, why Babcock returned to the plant after lunch except to be available in the event the compressor did not operate properly after it was placed "on line":
 
 
 86
 Q. Why wouldn't you want him to leave before you were sure it [the compressor] was functioning properly?
 
 
 87
 A. Simply because, on many occasions we have experienced it's--our experience has been that things can go wrong right after you start up that piece of equipment [the compressor], and obviously you need the field representative to be there to assist if that is the case.
 
 
 88
 During Babcock's absence, Pennwalt employees McGowan and McAllister replaced the compressor suction cups and Pennwalt employees James Knight (Knight) and Sammy Bryant (Bryant) were connecting the discharge pipes from the compressor to the block valve here in issue and the Pennwalt air conduction system when Babcock returned.
 
 
 89
 Upon returning from lunch and after Knight and Bryant had completed their task of connecting the compressor discharge pipes to the air conduction system and while Babcock was conversing with Berkley and Wyatt, Berkley instructed someone to summon Hurt to start and operate the compressor that had, at this juncture, been placed "on-line" by Pennwalt employees. Hurt appeared with a large wrench that was necessary to open the block valve before the compressor was energized. At this juncture, a conflict in testimony occurred. Babcock testified that after the two dry runs had been successfully concluded and he had certified the compressor for "on-line operation," all of which occurred before he went to lunch, his responsibilities were concluded and he did not thereafter voluntarily or otherwise participate in the assembly and connection of the discharge pipes, or any of the remaining work, including the final energizing of the compressor, all of which was being conducted by Pennwalt employees during and after the lunch hour. No Pennwalt employee who was present at the time or immediately prior to the final energizing of the compressor with the exception of Hurt, including Wyatt, Berkley, McAllister, Knight, McGowan, Bryant, and O'Quinn, testified that Babcock gave them any instructions, individually or collectively, nor did they hear him instruct Hurt as to the manner in which the compressor should be energized, nor did they observe him in any way participate in the startup. Hurt, however, did testify by deposition that:
 
 
 90
 A. Well, I believe we started it two or three times without the valves in it. Then, shortly after lunch, well, they started putting the valves back in it after lunch. About three o'clock, they asked me to start it again. One of the machinists--I can't remember right now who it was--came and got me about three o'clock and said they was ready to start it again. At that time, I took an eighteen inch pipe wrench with me from the control room, anticipating I had to open the discharge valve. I asked Mr. Babcock if he wanted the discharge valve open before he started the machine, and he said, no, he wanted to warm the machine up first. Then, I asked him if the unloader valves were hooked up and operable, and he assured me they was. I waited for his instructions to start the machine. He told me I'd have to hold the start button in until the oil pressure reached seventeen pounds to keep the machine from kicking off. So, I did that. It started fine. Within just a matter of seconds, why, it blew up.
 
 
 91
 * * *
 
 
 92
 * * *
 
 
 93
 Q. I believe you also said that you came when they were ready to start the machine into plant operation, it was about three o'clock in the afternoon, and you came with a wrench.
 
 
 94
 A. Yes, sir.
 
 
 95
 Q. What kind of a wrench?
 
 
 96
 A. It was an 18 inch pipe wrench.
 
 
 97
 Q. And Babcock told you that it wasn't necessary to open the discharge valve?
 
 
 98
 A. No. He didn't say it wasn't necessary. I asked him if he wanted it open before I started the machine. He said he wanted to warm the machine up first.
 
 
 99
 Hurt further testified that he followed Babcock's instructions because factory representatives were usually in charge of instructing Pennwalt employees under similar circumstances. In any event, upon Berkley's order, Hurt energized the compressor and it exploded within seconds.
 
 
 100
 This action was initiated in common law negligence and product liability. The jury's responses to special interrogatories submitted by the court found no breach of express or implied warranty or negligence in the design or manufacture of the compressor or in the quality of Babcock's services in supervising and inspecting the assembly of the air compressor during its rebuilding thereby absolving Babcock and Cooper from all liability anchored in plaintiff's product liability cause of action.
 
 
 101
 In considering the cause of action asserted under common law negligence, the jury, in arriving at its decision, as evidenced by its answers to special interrogatories, assigned greater credibility to the testimony of Babcock and other Cooper witnesses than it did to the testimony produced by Pennwalt and its employee witnesses including Hurt, since it also absolved Babcock and Cooper of any negligence in the startup of the compressor, including the responsibility for opening the "block valve" the failure of which act proximately caused the explosion and resultant injuries and damages.
 
 
 102
 Accordingly, this appellate review is confronted with appellant's challenges to the district court's exclusion of the Green and Wyatt testimony which appellants charge would have resulted in a verdict other than that returned by the jury. Addressing the appellants' assignments of error, I am constrained to conclude that Section 324A imposes no extra-contractual duties upon Cooper or Babcock beyond those expressed in Cooper's contract with Pennwalt.
 
 
 103
 For the purposes of this discussion, the essence of Sec. 324A is incorporated into the following language: "One who undertakes, gratuitously or for consideration, to render services to another ...". In the instant case, appellants and the panel majority conceded that "if the purchase order was the only source of Babcock's duties, then, its clear language would prevail over any proffered testimony on Pennwalt's routine practices as a service customer." The parties are in accord that any liability imposed upon Babcock or Cooper had to result from an act by Babcock or Cooper that was beyond those acts specified in the written contract between Cooper and Pennwalt. The majority opinion urges that the undertaking, which is the predicate for a relationship between Pennwalt and Cooper, if one existed, was created by Sec. 324A Second Restatement of Torts through an application of the "good samaritan" doctrine as manifested by some affirmative act voluntarily performed by Babcock after his return from lunch. The record, however, fails to demonstrate any express or implied "undertaking." All the evidence is to the contrary as previously noted with the exception of Hurt's testimony which was discredited by the jury.
 
 
 104
 Neither Wyatt, Berkley, McAllister, Knight, McGowan, Bryant, nor any other individual who was present at the time of or immediately prior to the explosion of the compressor observed Babcock perform any act or issue any instruction to any Pennwalt employee concerning the startup of the compressor. Consequently, the evidence affords no support for appellants' argument or the panel majority's conclusion that Cooper, through Babcock, gratuitously undertook to render services beyond the contractual agreement between Cooper and Pennwalt to provide "services required for factory service man to inspect assembly of one 16 X 10 X 7 HACP Pennwalt air compressor CL # 106780." I am confident that the appellants are not urging that Babcock's mere presence in the vicinity of the working area here in issue, standing alone, is sufficient to unilaterally create a legal relationship between the parties that imposed a duty upon Babcock and/or Cooper beyond the existing contract between the principals. See Blessing v. United States, 447 F.Supp. 1160 (E.D.Pa.1978) (where inspector is not under legal duty to inspect premises, inspector only liable under Sec. 324 if he has physically undertaken to inspect the specific instrumentality causing the subsequent injury). Simply stated, the evidence fails to disclose any gratuitous undertaking by Babcock. Consequently, the "good samaritan" doctrine and its restatement in Section 324A is inapplicable. See Homer v. Pabst Brewing Co., 806 F.2d 119, 121 (7th Cir.1986) (under Good Samaritan "doctrine," the scope of duty is limited by the extent of the undertaking ... courts have "impose[d] a duty only to the extent actually assumed by the defendant"); Trosclair v. Bechtel Corp., 653 F.2d 162, 165 (5th Cir.1981) (to impose liability under Good Samaritan doctrine, there must be proof of a contractual undertaking or representations by defendant).
 
 
 105
 The instant situation is analogous to that presented by the hornbook example of a physician who inadvertently witnesses an accident and refuses to volunteer his services to assist the injured victims. The majority would impose liability upon the physician by creating a relationship between the parties by virtue of the physician's happenstance presence at the scene.
 
 
 106
 While custom and practice surely define the standard of care to which a party must conform after he has undertaken, for consideration or gratuitously, a duty, custom cannot alone create a legal relationship to perform a duty between the parties. See, e.g., Lee and Lindahl, Modern Tort Law Litigation and Liability, Sec. 3.27 at 92 (1988) ("[a]lthough custom and usage may be considered as evidence bearing on the question of negligence, they do not establish a duty ..."). Accordingly, Babcock's inaction did not render him liable given that he had no contractual or other legal duty to assist Pennwalt's employees.
 
 
 107
 Appellants argue and the panel majority concludes that Babcock and Cooper were subject to "obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction." Assuming, arguendo, the correctness of appellants' erroneous hypothecation, I am familiar with no principle of law that precludes a contractual waiver of any custom or practice within any given trade or industry. Here the contract between Pennwalt and Cooper would have accomplished such a waiver if one had been necessary. A review of existing legal precedent fails to surface any authority which would unilaterally impute responsibilities customarily undertaken by service representatives of companies other than a defendant company, to a defendant company, in this case, Cooper.
 
 
 108
 The reliance of the majority upon Raymer v. United States, 660 F.2d 1136 (6th Cir.1981), cert. denied, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982) to support its conclusion that Sec. 324A of the Second Restatement of Torts created a cause of action in favor of an injured plaintiff "separate and distinct from appellees' contractually created duties" is misplaced. Raymer arrives at no such conclusion either directly or by inference. To the contrary, Raymer recognized that the conditional predicate precedent essential to invoking Sec. 324A was an existing legal relationship between the parties, undertaken for a consideration or gratuitously. The decision addressed the "alleged negligence of employees of the Bureau of Mines of the Department of Interior in performing inspection activities required by the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. Sec. 801 et seq." Raymer 660 F.2d at 1137. Obvious from this circuit's definition of the Raymer issue, the decision considered and decided only the scope of the duties allegedly created, not by Sec. 324 Second Restatement of Torts, but rather by the Federal Coal Mine Health and Safety Act of 1969. Thus Raymer addressed events that occurred subsequent to a duty that had been purportedly created by a federal statute and not Sec. 324A. The plaintiff in Raymer never asserted or argued that Sec. 324 unilaterally imposed a duty upon a defendant without the defendant having affirmatively accepted the duty either gratuitously or for a consideration:
 
 
 109
 The plaintiffs argue that Kentucky recognizes the "good Samaritan" doctrine in the context of a third-party inspection. Under this doctrine one who undertakes an inspection and in doing so finds a danger has an obligation either to abate the danger or to see that the owner of affected premises does so. Thus they contend, once the government assumed the task of inspecting coal mines, with enforcement powers to correct violations of safety rules and regulations, it was required to act with reasonable care and is liable where it failed to do so. As did the district court, the plaintiffs rely principally on the decision of the Kentucky Court of Appeals (then the State's highest court) in Haddad v. Louisville Gas & Electric Co., 449 S.W.2d 916 (Ky.1970) (emphasis added).
 
 
 110
 Raymer, 660 F.2d at 1140.
 
 
 111
 The court in Raymer went on to observe and decide that:[1]
 
 
 112
 Furthermore, reliance would not have been justified in view of the scheme of the 1969 Act. Under the 1969 Act the role of the Bureau of Mines in promoting mine safety was strictly secondary. The Act provided that "the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such [unsafe and unhealthful] conditions and practices in such mines...." 30 U.S.C. Sec. 801(e). The purpose of the Act was declared to be the establishment of mandatory health and safety standards for coal mines and "to require that each operator of a coal mine and every miner in such mine comply with such standards...." Sec. 801(g) (emphasis added in both quotations). In the face of this language which completely negates the idea that responsibility for mine safety has been shifted to the federal government, it would have been unreasonable to rely on the mere failure of federal inspectors to require immediate abatement of the ROPS [Rollover Protection System] violation as an indication that the vehicle was safe. Our discussion of the provisions of the 1969 Act demonstrates that the second alternative basis of liability under Sec. 324A, "he has undertaken to perform a duty owed by the other to the third person," was not satisfied. The mine operator's duty to the miners to maintain safe conditions was unaffected by the 1969 Act and the mine inspectors did not assume this duty.
 
 
 113
 Raymer, 660 F.2d at 1143-44 (emphasis added). Moreover, the Kentucky courts have consistently declared that the custom and the practice of parties other than a defendant are irrelevant in assigning responsibility for negligent conduct under circumstances similar to those of the instant case.[2]
 
 
 114
 Apart from the inapplicability of Sec. 324A of the Second Restatement of Torts to the instant case, a review of the record discloses the patent impropriety of the excluded Green testimony. Appellants have, for purposes of this appellate review, characterized him as an expert, experienced in the customs and practices of field representatives servicing similar types of equipment under similar circumstances for customers similar to Pennwalt in the case at bar. Initially, the transcript of the record fails to support Green's professed qualifications.
 
 
 115
 Secondly, Green's qualifications notwithstanding, his proffered testimony does not, as appellants suggest, address the custom and practice of service representatives when servicing customers within the industry of Pennwalt.
 
 
 116
 The circumstances surrounding Green's proffered testimony confuse the substance of that testimony. The record disclosed that Green was presented to provide engineering expertise and opinion to support the plaintiff's product liability cause of action which charged design defects and/or Babcock's competence in supervising the reassembly of the compressor. The record further reflected that plaintiff's counsel inartfully attempted to extend Green's professed expertise beyond his experience by soliciting opinions calculated to place the ultimate duty of opening the block valve, the proximate cause of the injuries here in issue, upon Babcock and Cooper. After having explained the conclusory character of Green's proposed testimony to appellants' counsel, who promptly ignored the court's suggestion to restructure his interrogation, plaintiff's counsel directed a series of questions patently improper in form to Green which questions elicited equally improper, opinionated, obviously inadmissible responses. The trial judge properly excluded Green's testimony.
 
 
 117
 I regret the extended extrapolation from the record, however, the verbatim testimony best demonstrates the absurdity of appellants' interrogation and the correctness of the experienced trial court's ultimate ruling:
 
 
 118
 THE COURT: Well, I'm going to make it very clear, because I don't know who--he's acting as a juror deciding what the facts of this case are as to an essential issue to come to a conclusion, and I just don't believe he can do that.
 
 
 119
 MR. LOFTON: He can based on Mr. Hurt's testimony. You can ask him a hypothetical.
 
 
 120
 THE COURT: All right. You may go, but you got a problem there.
 
 
 121
 Let me make myself perfectly clear. I don't believe you can bring an expert in here to assist the jury on a fact that they can decide as well as the expert. It doesn't take an expert to determine whether Mr. Babcock's testimony is to be believed or whether the--
 
 
 122
 MR. HARDY: Hurt or any of the others.
 
 
 123
 THE COURT:--Hurt's testimony is to be believed. That is not a matter to be addressed to the expert. That is something that a jury does not need any help on.
 
 
 124
 Now, if he wants to testify about scientific or engineering matters, I'll hear his testimony, but not on matters which will not assist the jury. He is not a named juror.
 
 
 125
 MR. LOFTON: Can we not ask him to assume Mr. Hurt's testimony to be true for purposes of a hypothetical?
 
 
 126
 THE COURT: Well, I'd like to hear the hypothetical before it's asked. He can look at this--this engineer can look at this schematic and these photographs and he can tell whether this was a good design, bad design, good approach to the repair, bad approach to the repair, but I don't know that an engineer--the jury don't need an engineer to come in here and tell us who was in charge.
 
 
 127
 You understand that, sir?
 
 
 128
 WITNESS: Yes, Your Honor.
 
 
 129
 MR. OWENS: Hold on just a minute, two other things. On the hypothetical, on Hurt's deposition it would just be what--you want me to do that now or at the--
 
 
 130
 THE COURT: Yes, I want to hear it right now.
 
 
 131
 MR. OWENS: All right. I'd ask him to assume that Mr. Hurt has testified to the following, and then I'll refer to that deposition of Hurt where he says something to the effect, "Do you want the valve opened?" And he says that Babcock told him, "No, we're going to just warm it up some first." And then Mr. Hurt replies, "Well, are the unloaders connected up?" And Babcock replied, according to Hurt, "Yes, they are open and operable. They are operable and working," or something to ...
 
 
 132
 THE COURT: All right, let's get everybody on the same track.
 
 
 133
 Under Federal Rules of Evidence 702, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.
 
 
 134
 This gentleman is presented to the Court as an engineer. The first conclusion he reaches is as follows:
 
 
 135
 1. --and I'm reading from the report which has been handed to me at the bench.
 
 
 136
 "Harold Babcock, the plaintiffs' representatives and the person most knowledgeable in all aspects of compressor operations, was present and actually was performing a start-up operation. The Pennwalt personnel--"
 
 
 137
 MR. OWENS: Excuse me, sir. We had specifically asked him to delete the sentence you're about to read.
 
 
 138
 THE COURT: "--were actually working under his direction and control."
 
 
 139
 That sentence may not be referred to. That sentence does not--that conclusion does not require scientific, technical or specialized knowledge.
 
 
 140
 * * *
 
 
 141
 * * *
 
 
 142
 MR. SIMS: Judge, while we've got the jury out, why don't we address the other things in his report?
 
 
 143
 On Page 3 of his report he [Green] starts out, paragraph one: "Mr. Harold Babcock, an employee of the Cooper Engineering services, was negligent in that he allowed the start-up of the compressor without confirming the proper selection and installation of the external safety equipment and, further, did not confirm the compressor discharge was in open position. Both--"
 
 Continuing on, the next sentence:
 
 144
 "Both of these procedures were the final responsibility of the Cooper Energy Services representative since he was--"
 
 
 145
 THE COURT: That is a legal conclusion and will be stricken.
 
 
 146
 MR. SIMS: Okay. Is the entire paragraph stricken, ...
 
 
 147
 * * *
 
 
 148
 * * *
 
 
 149
 THE COURT: No, I said paragraph one. This man is an engineer; he's not a psychologist or--I'm not going to let him say Mr. Babcock knew more than these other people. That's not an engineering opinion; that's a psychological or educational opinion. And if he knew more, he'd had to give them a test, and I don't think he has. Just eliminate one and use his engineering opinion.
 
 
 150
 Do you understand that, Dr. Green--or Mr. Green?
 
 
 151
 WITNESS: Yes, sir, Your Honor.
 
 
 152
 * * *
 
 
 153
 * * *
 
 
 154
 A. They're both non-adjustable relief valves. You just--one is a Ford and one is a Chevrolet, you just take your pick.
 
 
 155
 Q. It's my understanding it's your testimony that in the design of this machine, way back when it was made, that should have been put in there by the manufacturer at that time as a design factor in the manufacturing of this machine, is that correct, sir?
 
 
 156
 A. That's true. An integral relief system, that's correct, sir, to keep it from self-destruction if somebody makes a mistake.
 
 
 157
 MR. RUSSELL: I believe that's all I have. Thank you, sir.
 
 AVOWAL DIRECT EXAMINATION
 BY MR. OWENS:
 
 158
 Q. Mr. Green, did you reach any conclusions, or referring to Page 2 of your report, following your study of the material provided to you in the visit to the Pennwalt plant, Calvert City, Kentucky?
 
 
 159
 A. Yes, sir, I did.
 
 
 160
 Q. Would you state what those are, please?
 
 
 161
 * * *
 
 
 162
 * * *
 
 
 163
 A. "Mr. Harold Babcock, the manufacturer's representative, and the person most knowledgeable about all aspects of the compressor operation, was present and actively was performing the start-up operation. Pennwalt personnel were actually working under his direction and control."
 
 
 164
 Q. All right. In relation to that, what experience do you have that would qualify you to know what a manufacturer's representative does and Mr. Babcock was in control in performing the start-up operation?
 
 
 165
 A. Well, sir, I've worked under manufacturer's representatives, for them, on equipment. I acted as a manufacturer's representative, to go out and troubleshoot and repair equipment. And, in the last fifteen years, in the area that I work in today, in safety engineering, I frequently work with people from the factory that are--that are manufacturer representatives, that are most familiar with the equipment. And I know generally what their procedures are, sir.
 
 
 166
 Q. Regarding the block valve not being open and the rising stem not being out, does that indicate anything as far as what should have been done by the manufacturer's representative?
 
 
 167
 A. Yes, sir, it does.
 
 
 168
 Q. What?
 
 
 169
 A. First, it's perfectly obvious to anyone standing there that that valve was closed. The compressor should not have been started with the valve closed, sir. And I would place as much blame on Mr. Babcock for allowing it to be started in that condition as I would on Pennwalt, sir.
 
 
 170
 Q. As far as the relief valve that Pennwalt had not installed, that is in issue here, what is your opinion, if you have one, as to that, regarding the manufacturer's representative's performance?
 
 
 171
 A. Well, again, you know, I would fault Pennwalt for not putting one in there. But it would be perfectly obvious to Mr. Babcock that there is not a relief valve installed between the block valve and the compressor. That is something that is half the size of that big gate valve. It would be obvious to anyone. And it is my opinion that Mr. Babcock should not have even considered starting that compressor up without having a relief valve installed, sir.
 
 
 172
 Q. Okay. Would you go to item number two--two through six in your report?A. All right, sir. Item two. During the start-up operation, the compressor discharge block valve was left in the closed position. I don't think anybody contests that.
 
 
 173
 THE COURT: That's why we are making an avowal on that. That was openly discussed before the jury, that the block valve was closed, was it not?
 
 
 174
 MR. HARDY: Yes, sir.
 
 
 175
 MR. REED: Yes, sir.
 
 
 176
 * * *
 
 
 177
 * * *
 
 BY MR. OWENS:
 
 178
 Q. That's all right. Turn to number one on the next page. That I'm sure was not let in, and ask you what that conclusion was.
 
 
 179
 A. All right. I reached two conclusions. Number two, we've already discussed. Number one states that:
 
 
 180
 "Mr. Harold Babcock, an employee of Cooper Energy Services, was negligent in that he allowed the start-up of the compressor without confirming the proper selection and installation of external safety equipment, and he further did not confirm that the compressor discharge valve was in an open position. Both of these procedures were the final responsibility of Cooper Energy Services' representative, since he was in effect the expert on the job and was employed by Pennwalt as a factory engineer to bring the compressor back on line."
 
 
 181
 MR. OWENS: Thank you, sir.
 
 AVOWAL CROSS EXAMINATION
 BY MR. HARDY:
 
 182
 Q. Mr. Green, I believe your experience with the factory representative prior to your receiving an engineering degree was as a roustabout in the oil fields?
 
 
 183
 A. No, sir. No, no. I worked in the oil field, but I worked for Columbia Southern Chemical Corporation, which I mentioned in my deposition, for two years, and that's primarily where I worked with factory representatives. I did repair work in the plant, sir.
 
 
 184
 Q. Was this with you working as a field service representative?
 
 
 185
 A. No. I was accompanying the field service representative to go in and operate the equipment, to determine why that equipment may have failed.
 
 
 186
 Q. Why would you have been accompanying the field service representative?
 
 
 187
 A. Because I don't know anything about the operation of the machine itself. The field man is an expert in setting up and turning on, operating it, making sure it's working properly. I would observe what was going on and make an analysis as why a failure would have occurred, sir.
 
 
 188
 The appellants' additional charge of error, namely, that Wyatt was precluded from testifying as to the existence of an industry-wide duty broader than that stated in the purchase order is equally illusory for reasons already discussed. Absent a legally imposed relationship between Pennwalt, Babcock and Cooper, beyond the agreement limiting Cooper's undertaking, appellants' representation that the trial court also improperly excluded testimony from Pennwalt personnel that they routinely looked to factory representatives as experts who did everything necesary to restart compressors being repaired or rebuilt is inaccurate and misleading.
 
 
 189
 Initially, Wyatt's testimony concerning the routine business practice in Pennwalt's industry of relying upon directions from manufacturers' representatives was cumulative, and already before the jury when Wyatt testified. Accordingly, if for no other reason, its exclusion was within the discretion of the court.
 
 
 190
 Again relying upon the testimony of the witnesses, the following evidence was presented to the jury:
 
 DEPOSITION OF HURT:
 
 191
 Q. Did you know Mr. Babcock prior to this occasion?
 
 
 192
 A. No, sir.
 
 
 193
 Q. But, you said it was the usual thing when a factory representative came that he would tell you what to do?
 
 
 194
 A. Yes, sir.
 
 
 195
 Q. I believe that it was your testimony that Babcock called the shots?
 
 
 196
 A. That's the way I put it, I guess.
 
 
 197
 * * *
 
 
 198
 * * *
 
 
 199
 Q. You knew Mr. Babcock was a factory rep. in there on the job; is that correct?
 
 
 200
 A. Yeah.
 
 
 201
 Q. You had seen him in there, and you knew that the procedure was with him or any factory rep. that if they tell you something to do on the machine, then that's what you do?
 
 
 202
 A. Right, because a lot of times we don't know what their intentions are or what they are wanting to find out or check the machines. We do whatever they want to do.
 
 
 203
 Q. In other words, he's an expert on it, and if he does something that might not, or you might wonder why, still he's the one in charge; is that your understanding?
 
 
 204
 A. That's right.
 
 TESTIMONY OF BERKLEY:
 
 205
 Q. Okay. What did you understand Mr. Babcock's duties to be?
 
 
 206
 A. To supervise the assembly and start-up of this machine.
 
 
 207
 Q. Would that have been normal procedure for factory representatives?
 
 
 208
 A. Absolutely. We have factory representatives on a lot of critical equipment, and that's what they come in and expect them to do.
 
 
 209
 * * *
 
 
 210
 * * *
 
 
 211
 Q. All right. Did the condition of the compressor seem to suit Mr. Babcock?
 
 
 212
 A. Yes.
 
 
 213
 Q. Did you intend for Mr. Babcock to come in and start it that afternoon?
 
 
 214
 A. Yes.
 
 
 215
 * * *
 
 
 216
 * * *
 
 
 217
 Q. And I take it from what you said that you understood from him [Wyatt] that Babcock was going to be in charge of the start-up?
 
 
 218
 A. I understood that he was a field service representative who is normally in charge of the start-up of any equipment they work on.
 
 TESTIMONY OF SKLAVOS:
 
 219
 Q. Mr. Sklavos, you were asked on cross-examination whether you depended upon Mr. Babcock only to work on the internal parts of the compressor, and you answered no. I asked you what did you depend upon Mr. Babcock for?
 
 
 220
 * * *
 
 
 221
 * * *
 
 
 222
 A. It's very typical, in similar occasions when a request is made for a field representative to--
 
 
 223
 THE COURT: What did you depend on him for?
 
 
 224
 A. I depended on him to inspect the compressor, make sure that the machine was overhauled and was put back to its original specifications, and also to be advised that if there were anything--any clearances, any tolerances, any safety devices,--any electrical or instrument changes that required to be made, I expect to him [sic], as an expert in this field, to advise us accordingly.
 
 
 225
 * * *
 
 
 226
 * * *
 
 
 227
 Q. Mr. Sklavos, I have just a couple further questions. You mentioned the things that you depended on Mr. Babcock for. Let me ask you during what period of time you depended on him?
 
 
 228
 A. From the time he arrived at the plant to, of course, the time he was released by us to go back home.
 
 
 229
 Q. My question is whether you [Pennwalt employees] depended on him only through the dry runs or through the final start-up?
 
 
 230
 A. We depended on him from, let's say for inspecting the equipment; making sure it was, like I indicated earlier, it was put back to its original specifications; have a dry run, which I believe it was done; and then put the equipment--start the equipment and observe it for a while to make sure that everything was functioning properly.
 
 
 231
 Secondly, had the testimony of Hurt, Berkley, and Sklavos addressed to Pennwalt's industry routine business practice to rely upon directions from manufacturers' representatives while on the premises been totally withheld from the jury, as Wyatt's cumulative proffered testimony was excluded, no error would have resulted for the same reasons that legally justified the exclusion of Green's testimony under Sec. 324A of the Second Restatement of Torts and the failure of the plaintiffs to prove the existence of a legal relationship between Babcock, Cooper, and Pennwalt beyond the contract which limited Cooper's liability to "services required for factory service man to inspect assembly of one 16 X 10 X 7 HACP Pennwalt air compressor CL No. 106780." Thus, having failed to prove the existence of a legal relationship between Pennwalt and Cooper and/or Babcock undertaken either for a consideration or gratuitously, beyond the terms of the written agreement between the parties, the issue of "reliance" addressed by part (c) of Sec. 324A is beyond the instant appellate review and need not be addressed.
 
 
 232
 The trial judge, having correctly distinguished between the two causes of action pursued by the plaintiffs, i.e. proof of products liability versus simple common law negligence and the nuances of the proof required to satisfy the plaintiffs' burden, in each instance, the rulings of the trial court and the verdict of the jury, should be affirmed.
 
 
 233
 Accordingly, I would affirm the trial judge's evidentiary rulings and the verdict of the jury.
 
 
 
 [1]
 Section 324A provides:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 (a) his failure to exercise reasonable care increases the risk of such harm, or
 (b) he has undertaken to perform a duty owed by the other to the third person, or
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 The gravamen of the instant case in considering the application of Sec. 324 is not subparagraph (c) as reasoned by the majority which presumes the defendant's undertaking to act but rather, as in Raymer, subparagraph (b) of the Restatement. The jury in the instant case, as did the appellate court in Raymer, concluded in its answers to interrogatories that Babcock and Cooper assumed no duties either directly or by inference beyond those limited responsibilities incorporated into the written agreement between Cooper and Pennwalt. Cooper and Babcock, the jury decided, had not "undertaken to perform a duty owed by the other [Pennwalt] to the third person [Pennwalt employees]." Since the juries' findings of fact, which are not clearly erroneous, are dispositive of the Sec. 324A argument, the "reliance" addressed in subparagraph (c) of Sec. 324A of the Restatement loses its viability and is of no consequence as an issue and, accordingly, need not be addressed by this court in its appellate review.
 
 
 [2]
 Kentucky law explicitly dictates that the custom and practices of other parties are irrelevant. "[E]ach case in court must stand on its own merits or fall by its own demerits." J.B. Colt v. Asher, 239 Ky. 235, 39 S.W.2d 263, 264 (1931) (evidence regarding the operation of similar machines was inadmissible). This principle has been repeatedly reaffirmed in later cases. See Humana Inc. v. Fairchild, 603 S.W.2d 918, 921 (Ky.Ct.App.1980) (evidence relating to nature of employment contracts between employer and other employees was of no relevance to Kentucky law cause of action). See also Cincinnati, N.O. & T.P. Ry. Co. v. Hare's Adm'x, 297 Ky. 5, 178 S.W.2d 835, 838 (1944) (evidence of practices or customs in relation to similar instances is not admissible; the question is what defendant did or did not do upon a particular occasion). Moreover, in cases analogous to the one at bar, Kentucky courts have decided that specific contractual provisions govern over evidence of industry custom or routine practice. See Alvey v. Kern, 354 S.W.2d 516, 518 (Ky.1962) (evidence with reference to construction of another house was inadmissible where contract set forth specific specifications to be followed in the particular case at bar). See also Simplex, Inc. v. Diversified Energy Systems, Inc., 847 F.2d 1290 (7th Cir.1988) (evidence regarding party's conduct with relation to other contracts not admissible); see also Anderson v. Malloy, 700 F.2d 1208, 1212 (8th Cir.1983)