991 F.2d 795
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jessie Sueleen HOWELL, Administratrix of the Estate of
Delmus E. Howell, Deceased, and Jessie Sueleen
Howell, Individually, Plaintiffs-Appellees,
v.
The HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY,
Defendant-Appellant.
 No. 92-5668.
 United States Court of Appeals, Sixth Circuit.
 April 7, 1993.
 
 Before JONES and SUHRHEINRICH, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The Hartford Steam Boiler Inspection and Insurance Company appeals the jury's verdict awarding $108,132.72 to Jessie Suellen Howell "to fairly and reasonably compensate the estate of Delmus E. Howell." Joint Appendix at 19. We affirm the district court's findings for the following reasons.
 
 I.
 
 2
 On November 21, 1989, Delmus E. Howell ("decedent"), a boiler plant operator employed by the United States Army ("Army"), died from asphyxiation when carbon monoxide escaped from boiler number 4, one of several gas-fired boilers in the powerhouse referred to as Building 157 at Fort Campbell, Kentucky. The fifty-nine-year-old decedent had been a boiler plant operator with the Army for approximately twenty-two years.
 
 
 3
 Prior to the decedent's death, the Army had entered into a contract with defendant-appellant The Hartford Steam Boiler Inspection and Insurance Company ("Hartford Steam") whereby Hartford Steam agreed to perform periodic inspections of the Army's boilers throughout the United States and Panama. The contract, drafted by the Army, enumerated five types of high pressure boiler tests:
 
 
 4
 Type A--Internal and External Inspection.
 
 
 5
 Type B--Internal and External Inspection followed or preceded by External Inspection while under Hydrostatic test.
 
 
 6
 Type C--External Inspection under Steam Pressure.
 
 
 7
 Type D--External Inspection while under Hydrostatic test.
 
 
 8
 Type E--Internal and External Inspection of expansion tanks used with High Temperature Water Boilers.
 
 
 9
 Award/Contract at 100002. Though the contract fails to define these five types of high pressure boiler inspections in any greater detail, the contract does provide:
 
 
 10
 C.2.3. High pressure boilers will be inspected semiannually. The primary inspection will be both internal and external. The secondary inspection, an external inspection under steam pressure, will be made approximately 6 months later. The Contractor should plan on making two visits to each installation. Typically the Contractor will perform [a] Type A inspection on boilers not operating and a Type C for boilers that are operating. On the second visit, the boilers previously tested for Type A will be inspected for Type C and those that had Type C will be inspected for Type A. Thus, all boilers will have both Type A and Type C inspection [sic] performed annually.
 
 
 11
 ....
 
 
 12
 C.3.3. Reports of inspection prepared by the Contractor shall set forth the physical condition of each object inspected as determined by inspection and shall list repairs or changes, if any, which the Contractor considers are required in order that safety and dependability of said object may meet the requirements of good engineering practices.
 
 
 13
 C.3.4. It is understood and agreed that the Contractor does not guarantee its inspections or reports and does not represent that its recommendations are necessary or that if such recommendations are followed, the equipment inspected will then be in serviceable condition. It is further understood and agreed that the Contractor will not be liable directly or indirectly by reason of any loss or damage to property or injury or death sustained by persons or any other loss, nor by reason of the liability of another therefore resulting from any accident to, or defect in, any equipment inspected; nor shall the Contractor be liable directly or indirectly of another therefore growing out of failure to make any inspection or any report.
 
 
 14
 Award/Contract at 100011-100012.
 
 
 15
 On March 22, 1989, Hartford Steam's inspector visited Fort Campbell and inspected boiler number 4 in Building 157. The "Boiler Inspection Report" indicates that a Type C ("external under steam") inspection was conducted. The inspector noted:
 
 
 16
 Internal Inspection (Describe Inspection Fully)--"N/A"
 
 
 17
 External Inspection (Condition of Seams, Tube Ends, Pipe Connections, Etc.)--"satisfactory"
 
 
 18
 External Inspection (Settings, Linings, Baffles and Boiler Supports)--"satisfactory"
 
 
 19
 Safety Valves--"lifted by hand; satisfactory"
 
 
 20
 Pressure Gage--"not tested"
 
 
 21
 Other Appliances--"satisfactory"
 
 
 22
 Regulators and Controls--"satisfactory"
 
 
 23
 March 22, 1989 Boiler Inspection Report at 1.
 
 
 24
 On September 26, 1989, a different Hartford Steam inspector conducted a Type A ("internal and external") inspection on boiler number 4 and noted:
 
 
 25
 Internal Inspection (Describe Inspection Fully)--"satisfactory"
 
 
 26
 External Inspection (Condition of Seams, Tube Ends, Pipe Connections, Etc.)--"satisfactory"
 
 
 27
 External Inspection (Settings, Linings, Baffles and Boiler Supports)--"satisfactory"
 
 
 28
 Safety Valves--"not tested"
 
 
 29
 Pressure Gage--"not tested"
 
 
 30
 Other Appliances--"satisfactory"
 
 
 31
 Regulators and Controls--"satisfactory"
 
 
 32
 September 26, 1989 Boiler Inspection Report at 1.
 
 
 33
 Following her husband's death, plaintiff-appellee Jessie Sueleen Howell ("Howell"), individually and as administratrix of her husband's estate, initiated this action in district court (diversity of citizenship jurisdiction) on November 20, 1990, under both tort (negligent inspection) and breach of contract theories of recovery. The district court subsequently dismissed Howell's breach of contract claim on summary judgment. Howell does not appeal that dismissal.
 
 
 34
 Howell tried her negligent inspection cause of action before the jury on March 2-5, 1992. On March 6, 1992, the jury determined that: Hartford Steam negligently inspected boiler number 4; Hartford Steam's failure to exercise ordinary care was a "substantial factor in causing the [decedent's] death"; the decedent's "percentage of fault" was 40%; Hartford Steam's "percentage of fault" was 60%; and, the damages awardable to Howell, "without regard to any allocation of fault," equalled $180,221.20. See Judgment in a Civil Case at 1-2. The district court judge reduced Howell's award by 40% (representing the decedent's "percentage of fault"), and ordered that Howell recover $108,132.72. Id.
 
 
 35
 On March 20, 1992, Hartford Steam timely filed "Defendant's Renewal of Motion for Judgment as a Matter of Law and Motion for New Trial." The district court denied Hartford Steam's motions on April 15, 1992. Hartford Steam thereafter filed a timely notice of appeal.
 
 II.
 
 36
 The Role of Restatement (Second) of Torts Section 324A
 
 On appeal, Hartford Steam argues:
 
 37
 The evidence is uncontroverted that the Type A and Type C inspections required by the contract did not require Hartford Steam to inspect the allegedly defective items; that the [National Board Inspection Code] as it existed in 1989 did not require Hartford Steam to inspect the allegedly defective items; and that Hartford Steam did not voluntarily undertake to inspect the allegedly defective items. Because absolutely no evidence exists that Hartford Steam undertook to inspect, either gratuitously or for consideration, the allegedly defective items, as a matter of law Hartford Steam cannot be held liable for negligent inspection of those items.
 
 
 38
 Appellant's Brief at 24.
 
 In response, Howell maintains:
 
 39
 In the course of these two (2) inspections, Hartford Steam failed to identify and/or correct the defective items with respect to boiler # 4 which caused Mr. Howell's death.... Hartford Steam contends that the nature of its contractual undertaking was to perform what are deemed Type "A" and Type "C" inspections. The contract before us in this case is vague at best. The only contractual guidance afforded us as to the meaning of these terms is that a Type "A" inspection is an "internal and external" inspection and a Type "C" inspection is an "external inspection under steam pressure." The contract itself fails to define what items are to be inspected pursuant to these Type "A" and Type "C" inspections. Moreover, the contract is silent as to what standards these inspections are to be performed in accordance with.
 
 
 40
 Hartford Steam claims, however, that the scope of its contractual undertaking was to perform these otherwise contractually undefined Type "A" and Type "C" inspections, and that such inspections were to be performed in accordance with National Board Inspection Code, as such was the purported intention of the parties. Neither the words National Board Inspection Code, nor any reference thereto, can be found in this contract. Briefly stated, Hartford Steam contends that the inspections made pursuant to its contractual undertaking did not comprise the defective items which resulted in Mr. Howell's death. To the contrary, however, Hartford Steam "undertook" to inspect these same defective items, and did so negligently so as to cause Mr. Howell's death. Mr. Howell relied upon Hartford Steam's inspections and in inadvertently so doing, such resulted in his demise.
 
 
 41
 Appellees' Brief at 6-7 (citations omitted).
 
 
 42
 In Raymer v. United States, 660 F.2d 1136 (6th Cir.1981), cert. denied, 456 U.S. 944 (1982), this court determined that the Supreme Court of Kentucky would impose the requirements of section 324A of the Restatement (Second) of Torts when evaluating a cause of action based on negligent inspection if the Supreme Court of Kentucky were to address the issue. "We believe the Kentucky court would impose essentially the same requirements for recovery, whether or not it adopted the precise formulation of the Restatement." Id. at 1142-43.
 
 Section 324A provides:
 
 43
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 
 
 44
 (a) his failure to exercise reasonable care increases the risk of such harm, or
 
 
 45
 (b) he has undertaken to perform a duty owed by the other to the third person, or
 
 
 46
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 
 
 47
 Restatement (Second) of Torts § 324A (1965).
 
 Interplay of Contract and Tort Principles
 
 48
 Though the appellant argues that "the contract between the Army and Hartford Steam does not create any duties running from Hartford Steam to Mr. Howell," Appellant's Brief at 22, section 324A's duties "arise by operation of law, separate and distinct from appellees' contractually created duties." McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1270 (6th Cir.1988). In fact, "[t]ort duties 'are obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction.' " Id. (citation omitted).
 
 
 49
 Pursuant to section 324A, an inspector is subject to liability to a third person:
 
 
 50
 where the harm is suffered because of the reliance of the other for whom he undertakes to render the services, or of the third person himself, upon his undertaking. This is true whether or not the negligence of the actor has created any new risk or increased an existing one. Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk.
 
 
 51
 Restatement (Second) of Torts § 324A cmt. e (1965). See also Restatement (Second) of Torts § 324A cmt. d, illus. 2 (1965) ("The A Telephone Company employs B to inspect its telephone poles. B negligently inspects and approves a pole adjoining the public highway. Because of its defective condition the pole falls upon and injures a traveler upon the highway. B is subject to liability to the traveler."); Restatement (Second) of Torts § 324A cmt. d, illus. 3 (1965) ("The A Company employs B as superintendent of building construction work. One of his duties to A Company is to inspect a scaffold erected by an independent contractor, to make sure that it is safe for A Company's workmen. B negligently fails to inspect the scaffold, and as a result of its defective condition, which would have been discovered by proper inspection, the scaffold collapses and C, a workman employed by A Company, is injured. B is subject to liability to C.").
 
 
 52
 Though the appellant maintains that "[t]here is no evidence in this record to raise even an inference that Hartford Steam voluntarily assumed any duty to any boiler plant operators," Appellant's Brief at 23, because "[t]he scope of Hartford Steam's duty is defined in the contract and that contract specifically excludes responsibility for wrongful deaths," id. at 23-24, Hartford Steam misconstrues the interplay of contract and tort law principles.
 
 
 53
 To the extent that Hartford Steam argues that it owed no duty to the decedent because he was not a party to the contract, the appellant's appeal must fail because section 324A tort duties are obligations imposed apart from any manifested intention of the parties to a contract and "arise by operation of law, separate and distinct from contractually created duties." McGowan v. Cooper Indus., Inc., 863 F.2d at 1270.
 
 Scope of Hartford Steam's Inspection
 
 54
 Howell's expert witness, Dr. David Dyer, testified that four factors contributed to the decedent's death:
 
 
 55
 THE COURT: What is your opinion, sir, as to what factors contributed to Mr. Howell being overcome by carbon monoxide?
 
 
 56
 THE WITNESS: [T]he air flow switch did not function properly, the furnace draft switch did not function properly, uptake damper switch probably did not act properly, and there was inadequate ventilation in the upper regions of the boiler. And those would be the main factors.
 
 
 57
 Joint Appendix at 312.
 
 On appeal, the appellant maintains:
 
 58
 Hartford Steam did not undertake to inspect the [furnace draft switch and the air flow switch], the uptake damper switch or the ventilation in Building 157 because those items were not within the scope of the Type A or Type C inspections required by the contract. Switches are electronic or electronically controlled devices. Switches are not within the scope of a Type A inspection or a Type C inspection. The ventilation of the building housing boiler No. 4 is not within the scope of either a Type A or a Type C inspection.
 
 
 59
 Appellant's Brief at 16-17.
 
 
 60
 Howell does not argue that Hartford Steam's negligent inspections occurred within the scope of its Type A and/or Type C inspections. Instead, Howell maintains that Hartford Steam gratuitously enlarged the scope of its inspections by noting "satisfactory" on the "Boiler Inspection Reports" next to the "Regulators and Controls" and "Other Appliances" boxes:
 
 
 61
 Succinctly stated, Hartford Steam's contentions are that the vague contract terms evince an intent not to assume a duty to inspect more than those items which comprise what are termed Type "A" and Type "C" inspections. Thus, Hartford Steam seeks to persuade this court that their inspector complied with its contractual duty (i.e., with the standard of care of the contract) rather than the broader standards and/or tort duties imposed under § 324A which arise separate and apart from any promises made under the contract, or intentions manifested by the Army and Hartford Steam. The terms Type "A" and Type "C" [and the] purported intention that the [National Board Inspection Code] should govern such inspections [are] not the only sources of Hartford Steam's duties owing to the Army and Mr. Howell. To the contrary, the tort duties imposed by § 324A are not so limited. Kentucky law imposes these separate and distinct tort duties upon Hartford Steam pursuant to its having affirmatively undertaken to inspect more than those items which allegedly comprise Type "A" and Type "C" inspections. The extent of this undertaking is a question of fact, the answer to which determines the scope of the act upon which liability may be premised.
 
 
 62
 There exists ample evidence of an undertaking on the part of Hartford Steam to inspect not only more than those items which comprise what is termed Type "A" and Type "C" inspections, but also to inspect the dangerous and defective items which caused Mr. Howell's death. The most compelling pieces of evidence contained in the record establishing such an "undertaking" are the inspection reports themselves, and the testimony of Hartford Steam's inspector. Specifically, Section V of these inspection reports entitled, "Inspection of Safety Devices," includes inspection of the boiler's combustion "regulators and controls." The defective [furnace draft switch and air flow switch] and uptake damper switch, which resulted in Mr. Howell's death, are safety devices requiring inspection under the "regulators and controls" portion of the inspection. Hartford Steam's inspector marked these safety devices as being ["satisfactory"] pursuant to both of the inspections prior to Mr. Howell's death.
 
 
 63
 Appellees' Brief at 12-13 (emphasis in original).
 
 
 64
 Howell's assertions are buttressed by the deposition testimony of Hartford Steam's inspector, Baltazar Cartagena ("Cartagena"), who inspected boiler number 4 on September 26, 1989 (a Type A inspection). Though Cartagena marked "Sat." next to the "Boiler Inspection Report" box labeled "Regulators and Controls--Feed Water, Damper, Combustion, Etc.," he testified:
 
 
 65
 ATTORNEY: It was your understanding that it was not your job to test the combustion regulators or to test the combustion controls?
 
 
 66
 CARTAGENA: It is not our job.
 
 
 67
 ....
 
 
 68
 ATTORNEY: But on this line on the report, though, you could have put not tested on this line, couldn't you?
 
 
 69
 CARTAGENA: No, you cannot say not tested because you have to satisfy them that you looked around and you have seen the controls, that their boiler is equipped with that control. It doesn't tell you not to test it here.
 
 
 70
 ATTORNEY: That's what I don't understand. As I look at this form, it looks like you have put satisfactory for the combustion regulators and combustion controls, but as I understand it, you didn't even test those?
 
 
 71
 CARTAGENA: We don't do testing of the controls.
 
 
 72
 ATTORNEY: So, am I correct that you don't--at the time you filled out this form, you had not tested the combustion regulators?
 
 
 73
 CARTAGENA: No.
 
 
 74
 ATTORNEY: You had not tested the combustion controls?
 
 
 75
 CARTAGENA: No.
 
 
 76
 ATTORNEY: You had not tested the damper?
 
 
 77
 CARTAGENA: No.
 
 
 78
 Cartagena Deposition at 83-84.
 
 
 79
 Cartagena's deposition testimony and Hartford Steam's "Boiler Inspection Reports" support Howell's theory that, "[p]ursuant to its having voluntarily undertaken to inspect the damper and combustion controls, Hartford Steam assumed a duty greater than its purported contractual undertaking." Appellees' Brief at 21 (emphasis in original). Hartford Steam offers little to refute Howell's claim. Though Hartford Steam maintains that it was not contractually obligated to inspect the defective boiler components that resulted in the decedent's asphyxiation, the appellant fails to adequately explain why its "Boiler Inspection Reports" were marked "satisfactory" when tests weren't conducted. It is certainly foreseeable that the Army and its personnel would interpret Hartford Steam's findings to mean that the regulators and controls performed satisfactorily, not merely that the regulators and controls existed.
 
 
 80
 Though Hartford Steam argues that it did not undertake an inspection of boiler number 4's defective components, and claims that no inspection could have revealed the boiler's defective condition, the jury assessed the credibility of the witnesses and weighed the evidence before reaching its conclusion. Accordingly, we will not disturb the district court's findings. See generally Bank of Cumberland v. Aetna Casualty & Sur. Co., 956 F.2d 595, 597 (6th Cir.) ("In evaluating a JNOV under Kentucky law a trial court is required to consider the evidence in the strongest possible light in favor of the party opposing the motion and must give the opposing party the advantage of every fair and reasonable inference that can be drawn from the evidence."), cert. denied, 113 S.Ct. 204 (1992); J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co., 936 F.2d 1474, 1487 (6th Cir.1991) ("Unlike motions for directed verdicts and judgments notwithstanding the verdict, in ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence.").
 
 III.
 
 81
 Because we find Hartford Steam's remaining arguments meritless, we AFFIRM the district court's findings for the aforementioned reasons.