Jordan Mark SUTKIEWICZ,
Plaintiff–Appellant,

v.

MONROE COUNTY SHERIFF, et
al., Defendants–Appellees.

No. 95–1674.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 12, 1996.

Decided April 4, 1997.

Justin C. Ravitz (argued), Carl B. Downing (briefed), Patricia A. Stamler, Sommers, Schwartz, Silver & Schwartz, Southfield, MI, for Plaintiff–Appellant.

Ernest R. Bazzana (argued and briefed), Plunkett & Cooney, Detroit, MI, Mark H. Verwys, Grand Rapids, MI, for Defendants–Appellees.

Before: MARTIN, Chief Judge; KEITH and BATCHELDER, Circuit Judges.

KEITH, J., delivered the opinion of the court, in which MARTIN, C.J., joined. BATCHELDER, J. (pp. 362–64), delivered a separate dissenting opinion.

KEITH, Circuit Judge.

The Plaintiff–Appellant Jordan Mark Sutkiewicz ("Sutkiewicz") appeals the denial of his motion for a new trial pursuant to his 42 U.S.C. § 1983 claim against Defendants–Appellees Detective Sergeant Walter Carlson and Detective Captain Otra Lynch ("Carlson" and "Lynch"). Sutkiewicz alleged that Carlson and Lynch, under color of law, deprived him of constitutional rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. Specifically, Sutkiewicz argued that Carlson and Lynch are liable for malicious prosecution and false imprisonment under color of law. On appeal, Sutkiewicz maintains that the trial court committed numerous reversible trial errors including excluding as evidence important and probative audio tapes. For the reasons stated below, we **REVERSE** in part, **AFFIRM** in part, and **REMAND** to the district court for proceedings consistent with this opinion.

## I. STATEMENT OF FACTS

This case arose as a result of the abduction and subsequent murder of Gloria Krouse on July 10, 1981. On that day, Gloria Krouse went grocery shopping at a Kroger store located in a shopping plaza known as The Merchant's Landing in Washington Township, Michigan, near the Michigan–Ohio border. After an absence of several hours, Krouse's husband reported her missing to the police departments of Toledo, Ohio and Washington Township, Michigan.

Sometime later that same afternoon, Krouse's car was found in a field not far from the Kroger store. There were seven bags of groceries in the trunk and stains on the front seat of the car. The following day, Krouse's body was found in a wooded area in Erie Township, Michigan. Her throat was slashed and the rest of her body evidenced numerous stab wounds.

The Monroe County Sheriff's Department began a homicide investigation directed by defendant Captain Otra Lynch. Lynch assigned Detective Walter Carlson, also a defendant in this action, to head the investigation. There were a total of four police agencies, from Michigan and Ohio, who participated in the investigation.

There were no eyewitnesses to the abduction and murder. However, five people reported seeing a man near and around Krouse's car. Two of the five witnesses, Joy Lughabil and Sherry Badman, ("Lughabil" and "Badman") reported that they saw a man in Krouse's car going through her purse. Lughabil and Badman assisted in the creation of a composite drawing of the man they saw in the car. They described the suspect as a clean shaven, muscular white male, in his early twenties, with long black hair, wearing sun glasses with a black T-shirt. The other three witnesses provided similar descriptions of the suspect although with some variations.[1]

On July 21, 1981, Sutkiewicz was spotted in the field adjacent to the Merchant's Landing Shopping Plaza where Krouse's car was found. Sutkiewicz suffers from mental instability[2] and has only a seventh grade education. He is apparently a vagrant who is addicted to glue. Sutkiewicz was arrested because the police believed that he fit the description of the suspect. He was taken to the Monroe County Sheriff's Department

---

1. Witness Dana Dear ("Dear") described the suspect as being over six feet tall. Two other witnesses, Brian Hayden and Montana McClanahan ("Hayden" and "McClanahan") described the suspect as being five feet nine inches tall and skinny, and five feet eleven inches tall and medium build, respectively.

2. Nothing in the record provides information on the precise nature of Sutkiewicz's mental condition.

where he was interviewed by Carlson and a Detective Maurice. Sutkiewicz was advised of his rights and placed in a line-up where Badman and Hayden positively identified him as the person they saw around the car. McClanahan tentatively identified him as the person she saw near the car.

Sutkiewicz was then released from custody. Detective Carlson took him to the Calvary Baptist Mission in Toledo, managed by Reverend Charles Younts.[3] Sutkiewicz spent the following two nights at the Mission. While at the Mission, Younts recorded conversations with Sutkiewicz on two cassette tapes (the "Younts tapes"). During the taped conversations, Younts interrogated Sutkiewicz with respect to the circumstances of the Krouse murder in an attempt to procure a confession. Younts also drove Sutkiewicz to the murder site. When Younts felt that he had obtained enough information from Sutkiewicz, he called Carlson. After hearing the substance of Sutkiewicz's confessions from Younts, Carlson picked Sutkiewicz up from the Mission and took him to the police station to be interviewed and to take a lie-detector test.

Before administering the test, Detective Begin, the department's polygraph operator, again read Sutkiewicz his rights and interrogated him with respect to the Krouse murder. Begin was ultimately unable to administer the test to Sutkiewicz, because Sutkiewicz's mental instability rendered him an unfit subject for the test. However, Sutkiewicz was apparently stable enough to provide Begin 'a detailed account' of the murder. Sutkiewicz was also interrogated by Detectives Maurice and Carlson to whom he reportedly revealed details of the murder not yet known to the public, and admitted to killing Gloria Krouse.

On the basis of these confessions and the fact that Sutkiewicz was aware of facts surrounding the circumstances of the murder that had not been made public, Lynch prepared and delivered a recommendation for an arrest warrant to then Monroe County Prosecutor Michael LaBeau ("LaBeau"). Sutkiewicz was arrested and charged with the murder of Gloria Krouse. Sutkiewicz was eventually adjudged incompetent to stand trial; as a consequence, he was committed to the Center for Forensic Psychiatry (the "Center"), where he spent almost ten years.

Two and one-half weeks after Sutkiewicz was charged with first degree murder, the Sheriff's Department received information regarding an additional suspect, Thomas Gilbert ("Gilbert") of Toledo, Ohio. Within a month of the Krouse murder, Gilbert committed at least two multiple-stabbing throat-slashing murders in Northern Ohio. Two weeks after the Krouse murder, Gilbert also kidnaped, robbed, and sexually assaulted a young woman in Erie Township, Michigan, the same township in which Gloria Krouse's body was found. Captain Lynch, after having been notified of Gilbert's arrest, assigned Detectives Carlson and Maurice to investigate Gilbert as a possible suspect in the Krouse homicide. Among the evidence they discovered was a one-day Michigan fishing license that Gilbert had purchased. The fishing license was dated July 11, 1981, the day after Krouse was murdered. The license was sold to Gilbert by Fisher's Marina in Erie Township, Michigan, the same township in which Krouse's body was discovered. Moreover, the detectives also discovered that Gilbert's hand was cut and bandaged on July 11, 1981.

Carlson then began to play a greater role in the investigation. He went to Akron, Ohio, where Gilbert was detained, telling the Akron police that he considered Gilbert to be a "prime suspect" in the Krouse murder. While in Ohio, Carlson interviewed Gilbert, who all but admitted to the Krouse murder.[4] Carlson also interviewed several of Gilbert's friends who informed him that Gilbert often carried a "cut-off" butcher's knife tucked into

---

3. Sutkiewicz was homeless and the police supposedly did not want to lose track of him. They therefore took him to Younts's church.

4. Gilbert was cooperative, but would not respond verbally to any questions. When asked about the Krouse murder he would only motion "yes" or "no" by nodding his head in the appropriate direction. When Carlson told Gilbert that he believed that Gilbert committed the Krouse murder, Gilbert motioned "yes," then stated that he would not like to see anyone go to jail for what he did.

a belt inside his pants. Gilbert's friends took Carlson to Gilbert's fishing spot, which was approximately thirty feet from where Krouse's body was found. They also told Carlson that after the Krouse murder Gilbert refused to return to that spot. Moreover, they directed Carlson to the Merchant's Landing, stating that Gilbert often frequented the shopping plaza because the Kroger store there had a good deli department. On September 10, 1981, Gilbert was placed in a line-up. McClanahan, who had earlier tentatively identified Sutkiewicz as the person he saw near Krouse's car, positively identified Gilbert as the person near the car in the Merchant's Landing parking lot the day Krouse was murdered. A search of the home that Gilbert shared with his girlfriend, revealed a faded pair of jeans and an olive green colored T-shirt. Carlson and Lynch stated that they documented what they learned about Gilbert and forwarded the information to LaBeau. However, none of the reports regarding Thomas Gilbert or the Sheriff's Department's investigation of the Krouse murder subsequent to the arrest and arraignment of Sutkiewicz, has ever been located in LaBeau's files.

In the meantime, Sutkiewicz continued to be detained at the Center until March 4, 1991, ten years after he was committed. At that time, a new Monroe County Prosecutor, William Frey ("Frey") was informed that Sutkiewicz was now competent to stand trial for the Krouse murder due to a sudden improvement in his mental condition caused by a change in his medication. Unable to read LaBeau's files on Gilbert, Frey sent for the Sheriff's Department's files. After reviewing those files, Frey discovered the Younts tapes. Frey declined to prosecute Sutkiewicz because, in addition to his belief that Gilbert committed the murder, he thought that Younts's interrogation of Sutkiewicz probably tainted Sutkiewicz's later confessions. In June of 1991, Sutkiewicz was permanently removed from the Center.

Sutkiewicz then brought suit against Carlson and Lynch claiming that they violated his civil rights pursuant to 42 U.S.C. § 1983. Specifically, he alleged malicious prosecution and false imprisonment. The jury found in favor of Carlson and Lynch on both claims. On appeal Sutkiewicz alleges four errors by the trial judge. First, he objects to the exclusion of the taped interrogation—the Younts tapes—recorded by Younts during Sutkiewicz's stay at the Mission. Second, he argues that the trial court erred by limiting his proof to twenty-five hours and by allowing character testimony for the officers before their credibility was attacked. Third, he states that the district court erred in refusing to instruct the jury concerning mutually exclusive probable cause. Lastly, he claims that opposing counsel erroneously uttered prejudicial statements at trial. We find that Sutkiewicz is entitled a new trial because the trial court erroneously excluded the Younts tapes as evidence. We also find that his other assertions of error are without merit.

## II. DISCUSSION

Sutkiewicz's most forceful argument on appeal is that the trial court improperly excluded the contents of the Younts tapes. The Younts tapes consist of recordings of over two hours of conversation between Sutkiewicz and Younts. The tapes remained in the Sheriff's Department's files for almost a decade, and were not made available to the original prosecutor, Michael LaBeau. The new prosecutor, William Frey, listened to the tapes and determined that Sutkiewicz's later confessions were probably tainted by improper suggestion; he therefore declined to prosecute.

Sutkiewicz maintains that Carlson and Lynch played an active role in his improper detention at the Center. Sutkiewicz wanted to introduce the tapes at trial to prove that had they been made available to LaBeau, in light of the evidence concerning Gilbert, they would have negated the level of probable cause necessary to continue his confinement. Consequently, he alleges that the case against him would have been dropped. Sutkiewicz also contends that the tapes evidence a collusion between the officers and Younts, resulting in his unlawful incarceration.[5] Sut-

5. The dissent argues that the issue in this case is whether the content of the Younts tapes is rele-

kiewicz specifically argues that the officers used the willing Younts to cajole him into confessing and to plant certain evidence in his mind. The trial judge ruled that the contents of the tapes were irrelevant and inadmissable as to any issue being tried before the jury. The trial court further maintained that even if the tapes were relevant, admitting them would violate Federal Rules of Evidence Rule 403's proscription against admitting evidence that is extremely confusing and misleading to the jury. We disagree. We find the tapes relevant as to the issue of continuing existence of probable cause to detain Sutkiewicz.

## A. Standard of Review

▮ A trial court's decision to exclude evidence is reviewed for abuse of discretion. *Hancock v. Dodson,* 958 F.2d 1367, 1371 (6th Cir.1992). Exclusion of evidence is within the sound discretion of the trial court. *Douglass v. Eaton Corp.,* 956 F.2d 1339, 1344 (6th Cir.1992). The discretion of the trial court is not to be disturbed on appeal unless the reviewing court finds that the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party. *McGowan v. Cooper Indus.,* 863 F.2d 1266, 1271 (6th Cir.1988); FED.R.CIV.P. 61.

## B. Admissibility of the Tapes

We are confronted with two issues in this appeal. First, we must decide whether the district court erred in holding that the tapes were not relevant. Second, we must also decide whether the district court correctly held, that even if relevant, the tapes should

be excluded as confusing and misleading pursuant to FRE 403.

### 1. Relevance

▮ Evidence is relevant if it has the "tendency to make the existence of any *fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." FED.R.EVID. 401 (emphasis added). The "fact that is of consequence to the determination of the action," *i.e.,* the essential issue in this case, is whether Carlson and Lynch failed to disclose to LaBeau information indicating that probable cause to believe that Sutkiewicz murdered Gloria Krouse no longer existed.[6] An essential element of a 42 U.S.C. § 1983 claim alleging deprivation of constitutional rights under color of law is that probable cause did not exist at the time the claimant was subjected to the unconstitutional deprivation. *Albright v. Oliver,* 510 U.S. 266, 273–74, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (citing *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)); *Pyles v. Raisor,* 60 F.3d 1211, 1213 (6th Cir.1995);*Coogan v. City of Wixom,* 820 F.2d 170, 172 (6th Cir.1987); *see also DeAnda v. City of Long Beach,* 7 F.3d 1418, 1422 (9th Cir.1993).

The district court ruled, and Carlson and Lynch argue, that the audio tapes were properly excluded because they were not relevant to any issue being tried in the case. Sutkiewicz, however, contends that had Carlson and Lynch turned the tapes over to LaBeau, the contents of the tapes would have undermined LaBeau's original probable cause determination by marring the reliability of the confessions that established the basis for

---

vant to Sutkiewicz's claim that the officers knew that the tapes contained exculpatory information and withheld them from the prosecutor. We disagree. It is true that the trial court in a footnote stated that the content of the tapes was not relevant to the claim that the officers knew of and withheld exculpatory evidence from LaBeau. However, as the trial court noted and as we note here, Sutkiewicz also argued below that there was a conspiracy between the officers and Younts. Sutkiewicz wanted to use the tapes as proof of that conspiracy. It is to defeat Sutkiewicz's conspiracy claim that the trial court held that unless Carlson and Lynch knew what was on the tapes, the tapes could not be found relevant. The trial court's primary ruling, and the

one which is addressed in this Opinion, is that the content of the tapes is not at all relevant to the issue of continuing existence of probable cause to detain Sutkiewicz. It is that ruling which Sutkiewicz objects to and we address.

**6.** We will not disturb the trial court's ruling that, as a matter of law, probable cause existed to arrest Sutkiewicz on July 24, 1981. As noted above, the issue with which we are concerned is whether officers Carlson and Lynch later became aware of sufficient information negating probable cause to suspect Sutkiewicz, which could have spared him ten years of confinement.

probable cause to suspect Sutkiewicz. Thus, Sutkiewicz reasons that the tapes are relevant because they make the existence of a "fact that is of consequence to the determination of the action," *i.e.*, the existence of probable cause throughout Sutkiewicz's incarceration, less probable.

■ Probable cause has been defined as the "facts and circumstances within [an] officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing that [a] suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *see also Centanni v. Eight Unknown Officers,* 15 F.3d 587, 592 (6th Cir.1994). The definition implies that where there are facts and circumstances within an officer's knowledge that would lead a reasonable person to conclude that a suspect has not committed a crime, those facts would tend to negate probable cause, or at the very least, sway the probable cause calculus in favor of the suspect. *See, e.g., Reid v. State of New Hampshire,* 56 F.3d 332, 341 (1st Cir.1995) (indicating that exculpatory evidence may favorably affect the probable cause determination in favor of a suspect); *Haupt v. Dillard,* 17 F.3d 285, 290 & n. 5 (9th Cir.1994) (stating that "[p]robable cause to continue a prosecution may disappear with the discovery of new exculpatory evidence"). Additionally, even though an officer is not obligated to actively search for exculpatory evidence, when an officer is aware of exculpatory facts and circumstances, he has a duty to disclose those facts and circumstances to the prosecutor. *Sanders v. English,* 950 F.2d 1152, 1161 (5th Cir.1992); *Knudsen v. United States,* 966 F.2d 733, 737 (2d Cir.1992); *Geter v. Fortenberry,* 882 F.2d 167, 170 (5th Cir.1989).

Because we find the tapes relevant, due to the possible negating effect they may have on the probable cause determination, we hold that the order of the trial court excluding the audio tapes and denying Sutkiewicz's motion for a new trial is erroneous and inconsistent with substantial justice.

Sutkiewicz's primary argument is that the tapes contain exculpatory evidence that sways the probable cause calculus in his favor. We agree. An examination of the tapes reveals that they do contain exculpatory evidence that would tend to negate probable cause to suspect Sutkiewicz. Throughout the tapes, under the guise of friendship, Younts's attempts to secure a confession from Sutkiewicz. Younts repeatedly asks Sutkiewicz if he committed the murders.[7] He lectures Sutkiewicz on the importance of confession.[8] More importantly, however, the tapes contain evidence that Younts, at the very least led Sutkiewicz to "confess" certain facts about the murder,[9] and more likely fed Sutkiewicz

---

7. During Sutkiewicz's interrogation, the following exchange took place between Younts and Sutkiewicz:

> Younts: See, police are different man. They get a little rough sometimes. Now, just between you and me, alright, and the Lord too because he listens out here, now what you thinking about? Okay. Just honestly, okay? Now, if you did it now, would you tell me the truth?
> Sutkiewicz: Huh?
> Younts: If you did it would you tell me the truth? ... You sure you didn't?
> Sutkiewicz: I'm sure.
> Younts: Now be very careful between you Lord and like I said its just you and I. I don't want anything between us now. You sure you didn't do it?

The preceding exchange is repeated in one form or another throughout the tapes.

8. Younts states:

> Now I'm talking as a pastor now. You're a suspect to a degree. And it's something that you really got to think about. It's a matter of

ah, and here's something else, if you did it, sooner or later you gotta tell somebody. There's the whole thing. Nobody can keep something inside of them all the time. And it stays in there and it weighs at you inside. Sooner or later you gotta tell 'em, you gotta tell somebody about it. You have to get it out of your system. You have to, it's almost like a test.... On Friday night, on Friday night you gotta think about that woman when she came out of the store and she had all her groceries. You gotta think back on it and if you was there and went over to the car, exactly what happened. You gotta think, after it happened, you gotta think back and say alright. I took the car here, I dropped her off then, what did I do with my clothes, put them someplace. What did I do with the knife, where'd I put the knife. I hid the knife or threw it away someplace so nobody could find it and that's being honest.

9. For example in one instance during the interrogation Younts is trying to get Sutkiewicz to admit that he was at the scene of the abduction at the proper time:

those facts.[10] For example, with respect to the age of the deceased, Younts asks Sutkiewicz if she was young or old. Sutkiewicz replied that she was old. "How old?" asks Younts. "About 60." Sutkiewicz replied. "About 60? She wasn't in her 30s, ah 35?" asks Younts. As the district court itself noted after having examined the tapes:

> There are clearly questions as to whether Sutkiewicz was truly relating and describing his involvement in the Krouse murder to Younts or whether the statements were influenced or "tainted"—perhaps inadvertently—by Reverend Younts having strongly suggested to Sutkiewicz that he should confess and whether, by

> Younts: Okay, alright. And ha, now when was that? What time of the day [were you at the scene of the abduction]?
> Sutkiewicz: About 7.
> Younts: Seven? In the morning or in the evening.
> Sutkiewicz: Morning.
> Younts: Morning? Boy you were over there pretty early if you were over there before it opened then. There wasn't any shoppers, there wasn't anything going on at 7:00 in the morning at the shopping center before 7:00. Okay, now, then you wandered around wherever it is that you wandered okay? What'd you do, walk around or what?
> Sutkiewicz: Yeah.
> Younts: Were you just walking around out there? ... Now, you gotta think, now you gotta think careful on this. Now, during that day, okay, did you go back to the shopping center. And you gotta think very careful on it now, because here's the reason. If a couple people saw you back at the shopping center okay, in the later part of the afternoon, okay; if a couple people did see you there and your mind, and you're not thinking straight—here's my whole point—and you see, if you're not thinking straight and you don't remember going back there but you were back there and a couple people saw you back there and they can put you there, and say yeah, he was definitely there, we saw him there in the afternoon positively. You understand. You gotta think now wait a minute, now where did I go and could I possibly have gone back to the shopping center and just wandered around and looked here and there and then turned around and left again and wandered away somewhere else.... Now I can think of a hundred reasons for being at a shopping center. I go to the shopping center all the time.

At another time during the interrogation Younts is trying to get Sutkiewicz to "confess" to the color of the deceased's purse. Younts asks, "What color purse?" Sutkiewicz answers, "Red." Younts states, "You sure red? That's,

Younts's discussion of the facts of the murder, he "fed" Sutkiewicz facts that Sutkiewicz, in turn, related to the officers who interviewed him after they talked to Younts.

Undoubtedly, the strongest evidence linking Sutkiewicz to the murder are his confessions to Younts and the officers, and it is those confessions that provide the requisite probable cause.[11] Thus, if Sutkiewicz, through the tapes, is able to cast doubt upon the reliability of the confessions there can be no doubt as to the tapes' relevance.[12] As it is our conclusion that the tapes contain evidence that, if believed, would negate the

think back, not red, I don't think so. I don't think it was red. Think real careful."

10. Younts is often more subtle. To get Sutkiewicz to "confess" to facts, Younts would include the facts in leading questions. Thus, he asked:

> Younts: Well, if somebody's throat was cut where do you think most of the blood would go, when it came out?
> Sutkiewicz: Down, down the side of—
> Younts: Down what?
> Sutkiewicz:—the side of her throat.
> Younts: Down the side of her throat?
> Sutkiewicz: And her stomach.
> Younts: Down on the clothes too, I'm sure, right?
> Sutkiewicz: Right.

11. As the district court noted, the only evidence the officers had against Sutkiewicz was "the identification of two witnesses placing Sutkiewicz in the Merchant's Landing parking lot on the day of the murder and Sutkiewicz's questionable 'confessions.'" As recently as one month after Sutkiewicz was arrested, the officers were aware that there was another suspect who resembled the killer and who had committed a murder similar to the Krouse murder. They were also aware that Sutkiewicz was mentally ill and delusional, and that one of the witnesses unequivocally stated that Sutkiewicz was not the person she saw at the site of the abduction.

12. For example, the district court noted that "[t]he handwritten contemporaneous notes of Officer Carlson further evidence that he may been in contact with Reverend Younts during Younts's interviews of Sutkiewicz, and that Carlson may have been telling Younts information regarding the murder which Younts, in turn, related to Sutkiewicz." If this statement is true, then the tapes, in addition to Carlson's handwritten notes, would support Sutkiewicz's contention that Carlson conspired to deprive him of his constitutional rights.

requisite probable cause necessary to legitimize Sutkiewicz's continued detention, we find the tapes relevant.

### 2. Confusion and Prejudice

■■ Carlson and Lynch argue that the trial court justifiably excluded the tapes because they are highly confusing and prejudicial. Rule 403 of the Federal Rules of Evidence states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Although a district court has "broad discretion in balancing probative value against potential prejudicial impact," *United States v. Feinman*, 930 F.2d 495, 499 (6th Cir.1991), "[w]here a decision to exclude evidence on the basis of Rule 403 is overly restrictive such that it precludes a plaintiff from the full opportunity to present his case to a jury, it will be deemed an abuse of discretion." *Doe v. Claiborne County*, 103 F.3d 495, 515 (6th Cir.1996). We must look at the evidence in the light most favorable to its proponent, "maximizing its probative value and minimizing its prejudicial effect." *United States v. Zipkin*, 729 F.2d 384, 389–90 (6th Cir.1984).

■ In the instant case, we find that the district court committed reversible error because its ruling excluding the tapes, on the basis that they are prejudicial and confusing, is so overly restrictive that it denied Sutkiewicz a full opportunity to present his case to the jury. This Court has interpreted "unfair prejudice" to mean "the undue tendency to suggest a decision based on improper considerations; it 'does not mean the damage to a defendant's case that results from legitimate probative force of the evidence.'" *Doe v. Claiborne County*, 103 F.3d 495, 515 (6th Cir.1996) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993)). Otherwise relevant evidence may permissibly be excluded if it serves to inflame the passions of the jury. *United States v. Thomas*, 49 F.3d 253, 259 (6th Cir.1995); *see also Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir.1983) (holding that a trial court correctly excluded evidence that it believed would have inflamed the passions of the jury); *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1171 (6th Cir.1984) (Martin, J., dissenting) (stating that it is customary for trial judges to determine "whether or not the evidence would inflame the jury's passion" for Rule 403 purposes); *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1075 (5th Cir. 1986) (holding that "[d]eterminations of whether to exclude even relevant evidence because of its potential for prejudicial or inflammatory effects upon the jury are made by balancing inflammatory potential against the likely probative value of the evidence"); *Bohack Corp., v. Iowa Beef Processors*, 715 F.2d 703, 710 (2nd Cir.1983) (holding that trial judge correctly excluded evidence where evidence was inflammatory).

Looking at the evidence in the light most favorable to Sutkiewicz, we find that the probative value of the tapes is indeed quite high. The tapes undoubtedly lend credence to Sutkiewicz's claim that at some time during his confinement probable cause supporting continuing confinement ceased to exist. As the district court only addressed the Rule 403 concern in a footnote, and did not state with any specificity what it found prejudicial with respect to the tapes, it is difficult to surmise what facts the court relied on for its ruling. Admittedly, there are portions of the tapes that are confusing. However, the confusion is a product of Sutkiewicz's mental illness. As Younts is attempting to procure a confession from him, Sutkiewicz sometimes launches into nonsensical delusional tirades. We cannot uphold the court's ruling unless the court had determined that the tapes could serve to "inflame the jury and suggest a decision on an improper basis." *United States v. Thomas*, 49 F.3d 253, 259 (6th Cir.1995). Because the trial court's ruling was not based upon a determination that the tapes would have an inflammatory effect upon the jury, or that the tapes would lead the jury to decide the case on an improper basis, we find that the trial court abused its discretion in ruling that the tapes cannot be admitted under FRE 403.

### 3. Substantial Injustice

Finally, even though we find that the district court abused its discretion by withholding the Younts tapes from the jury, Sutkiewicz cannot be granted a new trial unless the abuse of discretion resulted in substantial injustice. *McGowan v. Cooper Industries*, 863 F.2d 1266, 1271 (6th Cir.1988). The circumstances of this case compel us to find that the trial court's exclusion of the Younts tapes resulted in substantial injustice. Sutkiewicz spent ten years confined in a mental facility as a result of a crime for which he was never tried, and of which it was apparent to the police, mere months after he was confined, that he was innocent. Soon after his arrest and detention, the Sheriff's Department was made aware that another individual, Thomas Gilbert, was more than likely the one who killed Gloria Krouse. Not only did they not provide that information to the prosecutor,[13] but they may have been involved in an attempt to unconstitutionally acquire a confession from Sutkiewicz. Due to the court's exclusion of the Younts tapes, Sutkiewicz was unable to put before the jury a key piece of relevant evidence that would lend credibility to his assertions. This deficiency resulted in substantial injustice as Sutkiewicz was denied a full opportunity to present his case to the jury. *See Doe v. Claiborne County*, 103 F.3d 495, 515–16 (6th Cir.1996); *DXS, Inc., v. Siemens Medical Sys., Inc.*, 100 F.3d 462, 476 (6th Cir.1996). As Sir Edward Coke noted "It is the worst oppression, that is done by colour of justice." SIR EDWARD COKE, SECOND INSTITUTE 48. Because exclusion of the tapes resulted in substantial injustice, we are obliged to rule that the tapes should have been admitted as relevant evidence.

### III. OTHER ASSERTIONS OF ERROR

Sutkiewicz also urges reversal on other grounds, but they are substantially without merit. Sutkiewicz argues that the trial court erroneously limited his presentation of evidence. In *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 609 (3d Cir.1995), we held that a district court has broad discretion to place limits on the presentation of evidence to prevent delay, waste of time, and needless presentation of cumulative evidence. In light of the fact that the trial court's twenty-five hour limit applied to both parties, we cannot find that the court abused its broad discretion.

Sutkiewicz also claims that the trial court improperly allowed character testimony in favor of the defendants. Because Sutkiewicz ·alleged that the officers deliberately withheld exculpatory information in an attempt to frame him for murder, the trial court properly allowed the defendant's credibility to be admitted into evidence under Rule 608. As to Sutkiewicz's jury instruction complaint, in *Cox v. Treadway*, 75 F.3d 230, 237 (6th Cir.1996), we held that a refusal to give a jury instruction is reversible error if: (1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case. It is only when the instructions given, viewed as a whole, are misleading, that a reversal of judgment is warranted. *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir.1990). The requirements of *Cox* and *Beard*, were not met in this case. Specifically, the instructions viewed as a whole, were not misleading. Therefore, reversal is not required.

Finally, Sutkiewicz argues that defense counsel committed numerous reversible errors. The determination of the extent of permissible comment and argument by defense counsel resides primarily in the sound discretion of the trial judge. *Ranger, Inc. v. Equitable Life Assur. Soc. of U.S.*, 196 F.2d 968, 975 (6th Cir.1952). The party seeking a new trial must make a concrete showing that the misconduct of counsel consistently permeated the entire trial from beginning to end. *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir.1980). Sutkiewicz has failed to make such a showing.

---

**13.** As the trial court noted, the "Defendants have been unable to offer any plausible explanation for" their failure to reveal the exculpatory evidence to LaBeau.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the trial court denying Sutkiewicz's motion for a new trial on the basis of relevance and prejudice. Because Sutkiewicz's other allegations of error are without merit, we **AFFIRM** the trial court's order denying his motions for a new trial on those grounds and **REMAND** to the district court for proceedings consistent with this opinion.

BATCHELDER, Circuit Judge, dissenting.

I must respectfully dissent. The majority says that the issue before us on appeal is whether the Younts tapes contain evidence that is relevant to prove the continued existence of probable cause to detain Sutkiewicz. By thus stating the issue, the majority is able to hold that the district court erred in refusing to permit the Younts tapes to be introduced into evidence. But the majority's statement of the issue, although it permits the conclusion the majority wants to reach, is clearly wrong, and the conclusion is wrong as well. For the reasons that follow, I would affirm the district court's ruling that the tapes are not relevant to the issues in the case.

Sutkiewicz claims in this action that officers Carlson and Lynch violated his constitutional rights[1] and committed the state torts of false imprisonment and malicious prosecution by failing to inform the prosecutor about exculpatory evidence of which they were aware. To prevail on these claims, Sutkiewicz was required to prove that Carlson and Lynch *had knowledge* of evidence that cast doubt on the legitimacy of the probable cause supporting his continued detention and failed to bring this evidence to the prosecutor's attention. Evidence relative to probable cause that Carlson and Lynch did not know

of is immaterial to this action. *See Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979) ("This Court repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances *within the officer's knowledge* that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed ... an offense.") (citations omitted) (emphasis added); *see also Clarke v. Montgomery Ward & Co., Inc.*, 298 F.2d 346, 348 (4th Cir.1962) ("A person who places before a prosecuting officer information upon which criminal proceedings are begun, and who later acquires additional information casting doubt upon the accused's guilt, should be under an obligation to disclose his discovery to the prosecutor."); *Simmons v. Telcom Credit Union*, 177 Mich.App. 636, 442 N.W.2d 739, 742 (1989) ("Notwithstanding the fact that a person who has instituted a criminal proceeding may have had probable cause for the commencement thereof, if that person afterwards acquires a means of asserting that the charge is not well-founded, his failure to intervene and have the prosecution discontinued ... may render that person liable ....") (citation omitted).

Sutkiewicz claims that these officers knew that the Younts tapes contained exculpatory information.[2] He attempted to prove that the officers knew of that exculpatory information by introducing the content of those tapes into evidence. The district court, however, ruled that unless Carlson and Lynch actually knew what was on the tapes, the content of the tapes was not relevant to Sutkiewicz's claim that the officers knew of exculpatory evidence and withheld it from the prosecutor. Therefore, the district court ruled, unless Sutkiewicz could present some evidence that the officers had listened to the

---

1. Neither the majority, nor Sutkiewicz, explains exactly which constitutional right Carlson and Lynch allegedly violated. *See Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) ("The first step in any [1983 action] is to identify the specific constitutional right allegedly infringed.") (citation omitted). For the purpose of this dissent, I will assume that Sutkiewicz has some cognizable constitutional claim.

2. Although it is not material to this appeal, I think it is worth noting that these tapes were the least damning of the evidence upon which Sutkiewicz based his claim against the officers. All of the other evidence was admitted, but the jury still returned a verdict in favor of the defendants.

tapes, the content of the tapes was not relevant and was inadmissable.[3]  Although Sutkiewicz was afforded numerous opportunities to produce such evidence, he did not do so.

The narrow issue before us on appeal is whether the content of these tapes is relevant to Sutkiewicz's claim that the officers knew that the tapes contained exculpatory information and withheld them from the prosecutor.  The majority opinion never addresses this issue at all.  Rather, the majority addresses an entirely different relevance issue, namely, whether the content of the tapes is relevant to the continuing existence of probable cause to detain Sutkiewicz.  The majority focuses solely on its interpretation of the content of the tapes,[4] concluding that because "the tapes contain evidence that, if believed, would negate the requisite probable cause necessary to legitimize Sutkiewicz's continued detention, we find the tapes relevant."  And because the content of the tapes may bear on the probable cause, the majority concludes that their exclusion denied Sutkiewicz a fair trial.

3.  During the trial, a lengthy exchange took place between the judge and counsel for Sutkiewicz concerning the admissibility of the content of the tapes.  The judge explained that the officers' failure to listen to the tapes might be probative of deliberate indifference or relevant to the reasonableness of their actions, but that, unless there were some evidence that the officers did in fact listen to the tapes, the content of those tapes would not be probative of those things.  The court then said:

"As I understand it, the officers have testified that they did not listen to the tapes.  Counsel for plaintiffs will be allowed to get into that and examine it in detail.  If, however, it turns out that one or both of these officers listened to the tapes, then the contents of the tapes I believe may well be relevant.  I've said that from the beginning.  But on the question of whether the tapes themselves have any probative value in this proceeding, I rule that they do not unless it can be established that the officers listened to the tapes."

To this, Sutkiewicz's counsel responded:

"I think the court is erring by accepting as fact the officers' self-serving statement that they didn't listen to the tapes."

The Court:

"I'm not accepting it as fact.  Then it becomes a matter of credibility.... If you have independent evidence that they did listen to the tapes, independent evidence that they did lis-

But the issue before the court is not whether the content of the tapes tends to make it more likely that there was no longer probable cause to detain Sutkiewicz.  The issue is whether the content of these tapes is relevant to prove that these officers *knew* that the tapes contained exculpatory evidence.  If there were any evidence in this record that the officers participated in the making of the tapes, or that their voices are recorded on the tapes, the content of the tapes might well be relevant to proving knowledge of the content.  But there is no such evidence.  Nothing in these tapes themselves provides any evidence that the officers were aware of what was recorded on the tapes.  And nothing in the record outside the tapes indicates that Carlson or Lynch knew, or should have known, that the Younts tapes contained arguably exculpatory information.  The content of the tapes therefore cannot make it more or less probable that the officers knew that the tapes contained exculpatory information.  FED.R.EVID. 401.  Regardless of the relevance of the content of those tapes to the continued existence of probable cause to detain Sutkiewicz, unless the officers

ten to the tapes, you'll be permitted to introduce that."

Counsel:

"I know this is convoluted and you would not accept it but the independent evidence, in part, is the tapes are so devastating to their claims in this case that they could not say anything other than, 'No, I didn't listen to that.' "

The district court rejected as bootstrapping Sutkiewicz's argument that because the content of the tapes was exculpatory, the officers *must have* listened to them and therefore the officers knew that the content was exculpatory.

4.  In two footnotes in its opinion, the majority embraces Sutkiewicz's theory that the defendants conspired to deprive Sutkiewicz of his constitutional rights, implying that the district court had likewise recognized that there was evidence to support this theory.  The district court, however, went to some lengths in its opinion denying the motion for a new trial to review all of the evidence presented at trial in support of this conspiracy theory.  The court concluded that there was simply no evidence to support such a theory, and that the contents of the tapes actually demonstrated that there was no conspiracy.  Particularly important in this regard is the district court's correct observation that the conspiracy theory had been advanced by Sutkiewicz wholly in relation to the issue of whether there had been probable cause for his initial arrest, a matter that was not an issue in the trial.

*knew* what that content was, they did not violate any right of Sutkiewicz by failing to call the tapes to the prosecutor's attention.

To the extent that we might read Sutkiewicz's complaint as raising a claim that these officers had a duty to listen to those tapes to see whether they might contain exculpatory evidence,[5] the content of the tapes is still irrelevant. If such a duty did exist, then the breach of that duty was the failure of Carlson and Lynch to listen to the tapes. The breach would have occurred whether or not the tapes contained exculpatory information, and the actual content of the tapes would not make the fact of the breach either more or less likely.

I would hold that the district court did not abuse its discretion in ruling that Sutkiewicz must first show that the defendant officers knew what was on the tapes before their content would be relevant to his claim that the officers were aware that the tapes contained exculpatory information but withheld them from the prosecutor. I concur in the majority's conclusion that the remaining assignments of error are without merit.

5. The majority does not read the complaint this way, but such a claim is implicit in Sutkiewicz's argument.