NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0402n.06

Case Nos. 21-1774/1803

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Oct 13, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ERIN ROSS; JOHN ROSS, | ) | |
| Plaintiffs-Appellants/Cross Appellees, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| PARROT'S LANDING, INC; TRAVIS | ) | MICHIGAN |
| PARROTT; DAVID WILSON, | ) | |
| Defendants-Appellees/Cross Appellants. | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

SUTTON, Chief Judge. When John Ross drove a rented jeep quickly up a sand dune, the car flew over the dune's crest and hit the sand nose-first on the other side. Ross, regrettably, suffered multiple spinal injuries. Ross sued the rental company and its employees. After a four-day trial, the jury decided a series of negligence questions, mostly in the defendants' favor. The jury found that Ross suffered $1 million in economic losses, but that he was the main cause (76%) of the accident. Consistent with both parties' understanding of Michigan law, that amount was ultimately reduced to zero to account for his proportion of fault and the disability insurance award he received. Ross challenges two features of the jury trial on appeal: the district court's time limits on the parties' presentations of their cases, and its decision not to give a special jury instruction that the jury could not consider the release Ross signed when he rented the jeep. Seeing no reversible error, we affirm.

I.

The Silver Lake Sand Dunes loom over the eastern shore of Lake Michigan. Driving off-road up and down the Dunes is a popular attraction at Silver Lake State Park. Parrot's Landing provides jeep rental packages for visitors. On a visit to the Dunes in August 2017, John Ross, a doctor, and some relatives selected a Parrot's Landing rental package that included a one-hour dune tour with a guide and an hour of "on-your-own-time." R.101 at 13–14.

Before heading out, Ross signed a rental agreement, which released Parrot's Landing "from any liability for consequential, special or punitive damages in connection with th[e] rental or reservation of a vehicle." R.1-42 at 3. Other paragraphs disclaimed all warranties and released Parrot's Landing from "all claims for loss of, or damage to, . . . personal property." *Id.*

During the supervised hour, Ross's tour guide, David Wilson, gave him instructions on how to drive the jeep in the sand and how to go up and down the dunes. *See* R.232 at 117–23, 126–27 (Wilson testifying that he tried to "balance . . . how to get [people] up and over safely, but [also] how to keep them so they have enough power at just the right time").

When Wilson left after the supervised hour of driving, Ross drove toward Hill Three. On Ross's first attempt, he drove up the east side and safely descended. On the second go-around, he drove up the west side of the hill. But this time, the jeep tilted forward, went airborne, nose-planted, and rolled over. Ross shattered his cervical vertebrae.

Ross and his wife, Erin Ross, sued Parrot's Landing, owner Travis Parrott, and Wilson (collectively, Parrot's Landing) for negligence, gross negligence, and loss of consortium, among an assortment of other Michigan state law claims. The Rosses also sought a declaratory judgment that the rental agreement did not "waive, release, or apply to" their claims. R.1 at 49–50. Parrot's Landing raised several affirmative defenses, including that the release defeated the Rosses' claims.

2

After discovery, Parrot's Landing moved for summary judgment on eleven of the claims, all but the declaratory judgment claim with respect to the release. The district court denied summary judgment as to the negligence, gross negligence, and loss of consortium claims, granting it on the other presented grounds.

Having trimmed the issues for trial, the district court entered an order limiting each side to four hours for presentation of their evidence. The Rosses moved for more time, arguing that they intended to present at least thirteen witnesses and required five to six days. The district court was receptive but was not inclined to allow the full time requested. It amended its order to allow each side seven hours. The Rosses did not object.

At the pretrial conference, the court asked the parties about the release issue, noting that none of the parties' final pretrial conference materials—including the trial briefs, the statement of the case, and the proposed pretrial order—mentioned it. The Rosses explained that they would forgo their declaratory judgment release claim and file a formal notice of dismissal. The Rosses dismissed their claim a few days later.

During a deposition on the eve of trial, a previous rollover victim noted that he had signed a waiver. Worried that Parrot's Landing would discuss the release at trial, the Rosses proposed a jury instruction just before trial to the effect that "[w]hether or not John Ross did or did not sign a waiver or release is not an issue in this case," and that the jury "must not consider any waiver or release." R.196 at 60. Parrot's Landing objected to it. The court did not resolve the point before the trial began, waiting until the charging conference at the close of evidence, but before closing arguments, to address the instructions altogether. The Rosses did not propose a motion in limine with respect to the testimony of any witnesses about the release.

At trial, counsel for Parrot's Landing, in cross-examining Ross, asked him if he had read the rental agreement. Ross testified that he had not read the agreement before signing it and did not know whether it had a waiver provision. That was the only testimony at trial about whether Ross signed the release.

The Rosses requested the special jury instruction about the release at the jury charging conference. The district court declined, noting that the issue was hardly mentioned during the trial and reasoning that it would be confusing to the jury.

During deliberations, the jury asked whether the release was available for review. The Rosses renewed their request that the jury be instructed not to consider the release. The court said that it was going to let the jury resolve the point and "figure out how it applies." R.233 at 95. The court agreed that the jury could read the rental agreement; it was in fact attached to the complaint and entered as an exhibit in the record. The district court instructed the jury that "all of the documents that were involved in the rental of the Jeep by Dr. Ross [were] in the joint exhibit book." *Id.* at 98.

The Rosses sought over $4 million on their negligence claims at trial. The jury found that Wilson, the jeep instructor, was not negligent. It found that Ross was negligent in driving the jeep, and he took the lion's share of the blame for the accident—at 76% of the negligence involved in the accident. The jury found that Parrot's Landing and Travis Parrott each bore 12% of the blame. The jury separately found that no one was grossly negligent. The jury found that Ross suffered $1 million in economic losses. Under features of Michigan law, with which all parties agree, the district court reduced the $1 million judgment to zero in view of Ross's comparative fault and his collection of disability insurance benefits that offset the award. The jury awarded $60,000 in loss

of consortium damages to Erin Ross, but the district court also reduced this to zero due to Ross's comparative fault.

The Rosses moved for a new trial on three grounds: (1) that the district court erred by imposing trial time limits on the Rosses, (2) that it should have given a special jury instruction not to consider the release, and (3) that the evidence did not support the verdict. The district court denied the motion. The Rosses appealed. Parrot's Landing filed a protective appeal—claiming that the district erred in denying summary judgment on the negligence and gross negligence claims and abused its discretion by striking some of Parrot's Landing's witnesses—to be considered only if the Rosses succeeded on their appeal.

## II.

## A.

A "district court has broad discretion to place limits on the presentation of evidence to prevent delay, waste of time, and needless presentation of cumulative evidence." *Sutkiewicz v. Monroe Cnty. Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997). While the relevant federal rules do not directly refer to a trial court's authority to limit each party's presentation of evidence, that power, as the district court recognized, is fairly inferred from what the rules do say. Rule 1 of the Federal Rules of Civil Procedure tells judges to construe and administer the rules "to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Rule 102 of the Federal Rules of Evidence says that the rules "should be construed" to avoid "unjustifiable expense and delay." Fed. R. Evid. 102. Other rules of evidence point in the same direction, noting the court's authority to exclude relevant evidence to avoid "undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403, and to "exercise reasonable control over the

mode and order of examining witnesses and presenting evidence," Fed. R. Evid. 611(a). *Cf. Ma v. Am. Elec. Power, Inc.*, 647 F. App'x 641, 645 (6th Cir. 2016).

We review a district court's time management decisions for abuse of discretion. *Sutkiewicz*, 110 F.3d at 361. Trial judges, unlike appellate judges, have a battle-tested sense for the time it takes to try a case; they know the proposed evidence in that case; they have developed a seasoned sense for how long it takes for certain types of evidence to come in; they have a keen sense for the parties' arguments and how they have developed from the beginning of the case; they understand the tendencies of the lawyers in the case; and they have come to understand the limits of a jury's patience. Under these circumstances, the trial judge is apt to have a far better sense of the time it takes to try a case than an appellate judge. Hence the discretion built into the standard of review. Even when a trial judge's time limits push the bounds of custom or fairness, moreover, the moving party must show prejudice. *See Sparshott v. Feld Ent., Inc.*, 311 F.3d 425, 433 (D.C. Cir. 2002); 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil § 2803 (3d ed. 2022); *see also Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

The many considerations that go into a time management order do not lend themselves to multi-part tests or even one standard. But in the past, we and other circuits have considered whether the district court gave notice of the limits and ample time for the parties to craft their case, gave the parties an opportunity to object to the limits at the outset and as the case proceeded, and grounded any time limits in the realities of the case. *See Trepel v. Roadway Exp., Inc.*, 40 F. App'x 104, 107–08 (6th Cir. 2002); *Ma*, 647 F. App'x at 645; *Benjamin v. Sparks*, 986 F.3d 332, 344–45 (4th Cir. 2021); *Navellier v. Sletten*, 262 F.3d 923, 941–42 (9th Cir. 2001).

Gauged by these considerations and the focused nature of this negligence case, the district court's time limits fell within its discretion. The court, to start, gave notice. After ruling on the

summary judgment motion and removing more than half of the claims, the court proposed an order limiting each side to four hours at trial, long before the final pretrial conference. That gave the Rosses time to craft their case and to object, which they did. The court was flexible. In response to the Rosses' objection, the court amended its order to permit each side seven hours. It cited the development of the claims remaining, the court's interest in a "cleaner, crisper, better-tried case," and the reality that multiple motions to exclude evidence remained unresolved. R.160 at 5–8. The Rosses, notably, did not object to this final allotment of time. Ultimately, the case took four days to try.

Nor does it appear that the time limits affected the jury's verdict. The Rosses take umbrage at the length of time that witnesses could testify. But they do not explain what meaningful testimony they would have elicited, if, for example, Erin Ross had more time to discuss the impact of Ross's injuries on her life than the sixty-eight minutes she used to testify.

Seeking to fend off this conclusion, the Rosses argue that the district court was inflexible. But the court listened to the Rosses' objection to the original four-hour limit on their presentation and nearly doubled the time allotted in response. The Rosses did not object to the new allotment then. Nor did they raise the point at the final pretrial conference. Nor did they raise the point during trial. All of this does not show hard-headed—and reversible—inflexibility on the part of the trial judge.

The Rosses separately object to the court's failure to explain witness by witness and exhibit by exhibit its reasoning for the time limits. But when the district court gives the parties notice of the time limits, gives them an opportunity to object, responds favorably to the only objection made in the case about time limits, and does its best to tie the time limits to case realities, it has not abused its discretion.

B.

The Rosses separately claim that they should receive a new trial because the district court denied their request for a special jury instruction that the rental agreement's release could not be considered in the jury's assessment of the negligence claims.

A district court abuses its discretion if (1) the denied instruction correctly states the law, (2) other instructions do not cover the point, and (3) the absence of an instruction interferes with the parties' ability to present their case. *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 396 (6th Cir. 2014). A holistic inquiry applies. Only when the instructions as a whole mislead the jury will we reverse a jury verdict. *Sutkiewicz*, 110 F.3d at 361.

Here are the key instructions given to the jury in connection with the negligence claims: Negligence meant "the failure to use ordinary care," or in other words "the failure to do something that a reasonably careful company or person would do." R.233 at 22. Ross had the duty to "use ordinary care for his own safety," while Parrot's Landing had the duty to "use ordinary care for the safety" of Ross, including by "properly training" David Wilson. *Id.* Gross negligence meant "conduct or a failure to act that is so reckless that it demonstrates a substantial lack of concern for whether an injury will result." *Id.* at 23. The jury was also instructed on each party's theories. Parrot's Landing claimed that Ross failed to act with ordinary care by "operating the vehicle in an unsafe manner." *Id.* at 21. Ross claimed that Parrot's Landing failed to act with ordinary care, and did so recklessly, because it: "failed to disclose or warn [him] of the known dangers associated with the Jeep tour and Jeep rental"; "failed to warn [him] of known risks of rollovers on certain dunes, including Hill 3, which was the site of prior rollovers"; "failed to instruct [him] regarding the safe operation of a Jeep, including failing to instruct [him] on how to safely climb, crest and descend dunes"; "improperly instructed [him] to floor it up the entire dune"; "failed to evaluate

[his] competency to safely drive the Jeep in the dunes"; "permitted [him] to drive the dunes after the dune tour without supervision"; and failed to properly train Wilson. *Id.* at 18–19.

In light of these instructions as a whole, it is not clear that the absence of a special jury instruction impeded the Rosses' theory of the case. For all of the jury's apparent interest in the release during deliberation, it did not decide that any language in the release barred the Rosses' requested damages. Had it thought so, it had no reason to proceed to decide who was negligent and to determine how negligent Parrot's Landing was or for that matter how negligent Ross was. The instructions that were given, moreover, told the jury only to look at the actions of the parties in failing to exercise care when determining negligence—not whether Ross signed an agreement or not.

All in all, this was a case in which both parties understood the issue from the outset and for reasons of their own chose not to join it until well into the trial—with all of the risks that come with such strategic decisions. Both parties clearly knew about the issue at the pleading stage. Hence the Rosses' declaratory judgment claim that the release did not apply. Hence Parrot's Landing's defense that the release barred recovery. Both parties knew about the issue at summary judgment. But neither one said anything about it in their papers. Both parties knew about the issue at the final pretrial conference and submitted the rental agreement with the release language as a joint exhibit. Yet neither one sought an instruction explaining the terms in the release language. Nor did anyone file a motion in limine to prevent references to it by witnesses. And while the release was not central to the pretrial depositions or the trial testimony, it did come up, confirming that no surprise about the point occurred. If this was sand bagging, it did not involve a lot of sand or a lot of effort by either party. Through it all, the conduct of both sets of parties before trial did

not change the reality that Ross signed a rental release. It just amounted to a fact in the case—in the same way that the full rental agreement was.

On this record, the district court did not commit reversible error in rejecting the Rosses' efforts to instruct the jury that as a matter of law the release did not apply to this accident. It had ample discretion to decide that, given the modest amount of testimony devoted to the issue, any sudden instruction on the issue would raise more mid-trial risks than fairness rewards.

This is not a case where the district court failed to offer a supplemental instruction on a central legal issue. If there is anything that the parties should agree on, it is that the release was not vital to either side's case. The Rosses dismissed the issue, Parrot's Landing spent about thirty seconds bringing it up in trial questioning, and the Rosses have insisted that Parrot's Landing made so little of the issue that it must have abandoned it too. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) (explaining that under Civil Rule 16(e) the final pretrial order supersedes all prior pleadings and controls the subsequent course of the action). And when the jury asked about the release during deliberations, the district court's response did not elevate its prominence in the case. The court informed the jury that they had all relevant documents in front of them, and that they must rely on the admitted evidence to resolve the case.

We affirm.